THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
THOMAS KLUXDAL, Defendant-Appellant.

First District (2nd Division)   No. 1—89—0421

Opinion filed December 31, 1991.

Law Offices of Terry Sullivan, Ltd., of Rolling Meadows (Terry Sullivan and Nancy J. Nicol, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Following a bench trial, defendant, Thomas Kluxdal, was convicted of murdering his wife, Beth Kluxdal (Beth), and his mother-in-

law, Muriel Dawson (Muriel). (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a).) Defendant was sentenced to natural life in custody of the Department of Corrections. He argues on appeal that (1) an incorrect standard of proof was used in evaluating his defense of insanity; (2) the finding of his sanity was against the manifest weight of the evidence; (3) his cross-examination of the State's expert was improperly restricted; (4) he was not proved guilty beyond a reasonable doubt of murdering Muriel; (5) he should have been found guilty but mentally ill; (6) the guilty but mentally ill statute is unconstitutional; and (7) his sentence is excessive. We reverse and remand for a new trial, for reasons which follow.

Daniel Todd, Beth's ex-husband, testified that he, his son Ryan, Beth, and Muriel were all inside Beth's apartment in Elgin, Illinois, on the afternoon of January 13, 1987. Beth opened the front door in response to the doorbell, and defendant entered with a gun in his right hand, which was pointed skyward. Defendant approached Beth repeating "now you're going to pay." Beth screamed "please Tom—don't hurt me," and Todd tried to calm defendant. Defendant ordered Todd to remain seated and told Beth and Muriel to go into a back bedroom. Todd heard both women screaming and begging not to be shot; he also heard some mention of money, to which Beth responded "please forgive me for that." Three shots were fired, and defendant walked out of the bedroom and left the apartment. Todd went into the bedroom and saw Beth and Muriel lying on the bed.

The autopsies of the victims showed that Beth had sustained three gunshot wounds; two bullets were recovered from her body. One bullet was removed from Muriel's body, which had passed through Beth's body. Both women died as a result of hemorrhagic shock.

Elsie Acevedo, an employee of Home Federal Savings & Loan (Home Federal) in Elgin, testified that she spoke with defendant at the bank on January 12, 1987, when he inquired about some bounced checks, and she told him that his wife had closed out their account. Defendant appeared very upset, and Acevedo asked her supervisor to talk to him. Before he left, defendant said he would "blow [his wife's] brains out."

Gloria Avilas, another employee of Home Federal, testified that she saw defendant in the bank on both January 12 and 13. On January 13, Avilas explained to defendant that his wife had been allowed to close out his account because she was on the signature card and had the right to withdraw funds. Defendant appeared nervous and upset; he mentioned his divorce and said that he was going to "get" his wife for what she had done.

Defendant's friend, Edward Taylor, was at the Elgin police department on January 13 to report vandalism of his automobile. He saw defendant enter the station and asked him why he was there; defendant responded "you're never going to believe this *** I just shot my wife." When Taylor asked if she was hurt, defendant replied "I hope so." He was arrested shortly thereafter.

The State rested, and defendant's motion for a finding was denied.

Defendant testified that on the morning of January 13, 1987, he picked up his 16-month-old daughter, Katie, from Beth's apartment for his scheduled visitation. Around 4 p.m. he gathered some items to return to Beth, including a copy of a check written by Beth to close out their account at Home Federal, and several pieces of Tupperware. He placed these items in a paper bag and put his gun inside the largest Tupperware container. Defendant believed that his wife would be forced to speak with him if he had the gun.

Defendant drove to his wife's apartment with Katie and the paper bag. He left his daughter in the car and carried the bag to the door. Beth opened the door, and defendant showed her the copy of the check, which he pulled from the bag. Defendant then drew the gun and walked into the apartment with his arm pointed skyward. He saw Todd and told him to stay seated. Beth and Muriel went into the bedroom, closed the door and held it shut, but defendant was able to push it open. Beth was dialing the telephone, but dropped it when defendant ordered her to do so. Defendant began to question Beth about some disputed items, including a television, the check, a silver dollar and the Tupperware. During this confrontation, Muriel became more and more angry and tried to talk to defendant. Beth said "I'm going to make sure that you never see your daughter again," and Muriel echoed that sentiment. At that point, defendant said that he "snapped" and "just shot." After firing three shots, defendant said that "[i]t was like I came out of a stupor." After a few seconds, he walked out of the bedroom and exited the apartment. Todd spoke to him, but he did not respond.

Defendant reentered his car and placed the gun on the floor behind his seat. He drove to his sister's house, where he left Katie. He unloaded his gun and walked to the police station, where he saw Taylor in the lobby. Defendant declared that he had shot his wife. Taylor asked if she was all right and defendant replied "I hope so." He was immediately arrested.

Defendant said that he had gone to Home Federal on January 8, 1987, and learned on that day that Beth had withdrawn all the money

in their account. He tried to discuss the matter with Beth, but she said "talk to my lawyer." On January 12, defendant made a deposit and talked to Acevedo; she gave defendant a copy of the check Beth had written. Defendant was unemployed and said that money had been a point of contention between him and Beth.

During cross-examination, defendant defined "stupor" as "a state where you don't know what you're doing." He claimed that he went into the stupor the moment that Beth and Muriel made the statement about his daughter, and remained in that state for five to seven seconds. He experienced a similar stupor when he was talking to the bank personnel on the day prior to the shooting.

Dr. Carmen Ciatteo, a board-certified psychiatrist, testified that he studied the police report, various psychological reports, and examined defendant for 90 minutes following his incarceration. He said that defendant's life was based on control, and that prior to the shooting, defendant had been losing control of himself and his environment. On the day of the shooting, defendant was suffering from an obsessive compulsive personality disorder, which generally is a lifelong condition. Evidence of this condition was defendant's penchant for argument, monotone voice, lack of close friends, and general distrust of others. His obsessive compulsive personality interfered with his interpersonal relationships to such an extent that it constituted a mental illness. This caused defendant to "lose control of his cognizance" on January 13, when the remark about his daughter was made. The stressors in defendant's life, including his divorce, unemployment, and financial situation, weakened his ability to cope with stress. If defendant had not been suffering from an obsessive compulsive personality disorder, the stressors "would not have led to the tragic action that was allegedly taken."

On cross-examination, Dr. Ciatteo admitted that he had not asked defendant about the specific events of January 13, 1987; he had relied entirely upon Todd's account contained in the police report. He also said that defendant's anger toward Muriel on that day was just as great as his anger toward Beth. Although defendant's objective in confronting the women with the gun was to get his wife's attention and gain control over himself and his environment, Dr. Ciatteo found it equally possible that defendant's design was to kill them.

Dr. Marvin Ziporyn, an expert in psychiatry, interviewed defendant while he was in Cook County jail. He found that defendant had a general history of interpersonal difficulties which could be attributed to his inflexibility. Defendant also was overly concerned with his financial situation. Dr. Ziporyn diagnosed defendant as having a com-

pulsive personality disorder on January 13, 1987, under which a person has very little tolerance for deviations from his perception of right and wrong. Beth's statement that defendant would never again see his daughter acted as the "straw that broke the camel's back." Dr. Ziporyn asserted that the stress of defendant's situation would not have been sufficient to induce an individual to react as defendant had without the personality disorder.

On cross-examination, Dr. Ziporyn said that defendant did not react violently to his lack of control at the bank because he knew his financial problems were not caused by incorrect behavior of the employees. In entering the apartment with the gun, defendant was psychologically attempting to intimidate Beth and Muriel into conforming their actions to his standard of appropriateness. Even if the threat about separation from his daughter had not been made, Dr. Ziporyn maintained that defendant still would not have been able to conform his conduct to the requirements of the law. During examination by the court, Dr. Ziporyn said that defendant had talked in some detail about his love for Katie; he stated, however, that he was not aware that defendant had left his daughter in the car, and that fact would require him to consider "what the possibilities of that might be."

After the defense rested, the State called Dr. Mathew Markos, a forensic psychiatrist, in rebuttal. Dr. Markos claimed to have examined defendant for one hour and was unable to detect any mental illness. A mentally disturbed person would not be able to carry out a series of sequential, goal-directed activities, as defendant had done prior to the incident. At the time of the offense, defendant was not suffering from any mental illness or defect which would have impaired substantially his ability to conform his behavior to the requirements of the law. He did not disagree with the conclusions of Drs. Ciatteo and Ziporyn; he simply did not have data sufficient to make their diagnoses. Dr. Markos also said that a personality disorder, such as an obsessive compulsive personality, would not impair an individual's ability to conform his conduct to the requirements of the law.

Defendant, called in surrebuttal, stated that Dr. Markos interviewed him for only three minutes and asked him a total of two questions.

The court found defendant guilty of murdering both Beth and Muriel and sentenced him to natural life in prison.

## I

Defendant first argues that the court imposed a greater burden of proof on the issue of insanity than was required by statute.

In presenting the defense of insanity, the burden is on defendant to prove by a preponderance of the evidence that he is not guilty by reason of insanity. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e).) In making its findings, however, the circuit court said:

> "I think the next area that I have to address is the issue of insanity. Did the defendant preponderate? Did they show me by *clear and convincing evidence* that [defendant] was insane at the time the act was committed?
>
>          * * *
>
> *** We, therefore, have an affirmative insanity defense, and at the close of the defense's case, I was not entirely convinced by *clear and convincing evidence* that this individual was insane *** I do not think that the defense has shown by *clear and convincing testimony* or preponderated the evidence that the defendant was insane at that time.
>
> *** I don't think that they have preponderated the evidence, especially in light of the defendant's selective and sometimes, many times, incredible testimony.
>
> *** I think the State has proved every element beyond a reasonable doubt. I do not think that the defendant has preponderated on the issue of insanity by *clear and convincing evidence*, and for that reason, the defendant will be found guilty of the offense." (Emphasis added.)

The circuit court is presumed to know the law and apply it properly, and that presumption is rebutted only when the record affirmatively shows the contrary. (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 322, 570 N.E.2d 344.) Here, the record contains strong affirmative evidence that the circuit court applied the wrong burden of proof in determining defendant's sanity. The court's repeated reference to a standard of "clear and convincing evidence" rebuts the presumption that the court properly applied the law.

Defendant relies upon *People v. Gutierrez* (1982), 105 Ill. App. 3d 1059, 1063, 433 N.E.2d 361, for the proposition that the court need not "state for the record the standard of proof [s]he has employed." In that case, defendant was convicted of leaving the scene of a vehicular accident involving death. (Ill. Rev. Stat. 1979, ch. 95½, par. 11—401.) He argued that because the court did not mention the required mental state in its findings, it treated the matter as a strict liability offense and did not consider whether defendant had knowledge of the accident. In rejecting that argument, this court held that the failure to mention the proper standard did not demonstrate that the circuit

court followed the wrong standard. *Gutierrez*, 105 Ill. App. 3d at 1063.

This case, however, does not involve the omission of the proper standard by the court. Instead, the court affirmatively recited the wrong standard at least four times. Although the court repeatedly used the word "preponderate" in conjunction with the term "clear and convincing," we are uncertain that the proper burden of proof was applied to the evidence of defendant's sanity. Defendant's conviction, therefore, must be reversed and the cause remanded for a new trial.

Because other issues may arise in defendant's new trial, we will address remaining arguments.

## II

Defendant claims that the court's determination of his sanity was against the manifest weight of the evidence.

Defendant is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).) The trier of fact determines whether defendant was insane at the time of the offense, and that finding will not be reversed unless it is so improbable or unsatisfactory as to raise a reasonable doubt of defendant's sanity, or is so contrary to the manifest weight of the evidence as to indicate passion or prejudice on the part of the fact finder. *People v. Wheeler* (1990), 194 Ill. App. 3d 178, 182, 550 N.E.2d 1170.

■ Contrary to defendant's assertion, the circuit court is not obligated to accept the opinions of psychiatrists proffered by defendant, but is entitled to consider contrary opinions of the State's expert. (*People v. Eckhardt* (1987), 156 Ill. App. 3d 1077, 1090, 509 N.E.2d 1361.) Further, the resolution of contradictory testimony by experts on the issue of whether defendant was legally insane at the time of the crime is for the trier of fact. (*Eckhardt*, 156 Ill. App. 3d at 1090.) Here, Dr. Markos, the State's expert, said that defendant was not suffering from a major mental illness at the time of the shooting which would have substantially impaired his ability to conform his behavior to the requirements of the law. Even if defendant did suffer from a personality disorder, Dr. Markos said that it would not impair his major mental functions.

Less credence was given to Dr. Ciatteo's testimony because he never spoke to defendant about the incident itself. Although he gener-

ally diagnosed defendant as having an obsessive compulsive personality disorder, he said that defendant's goal or mission in going to the apartment could have been to kill Beth. Dr. Ziporyn also said defendant had a compulsive personality disorder. Defendant, however, never told Dr. Ziporyn that he left his daughter in the car when he went to the apartment, a fact that the doctor said would require him to rethink his analysis. Further, Dr. Ziporyn said that defendant would not have been able to conform his conduct to the law even if Beth had not threatened defendant with separation from his daughter. The court also noted that despite Dr. Ziporyn's assertion that defendant is punishment-oriented regarding his crime, he showed no remorse for the shootings.

In addition, lay witnesses may express their opinions as to sanity if based on personal observation of defendant, including conversations with him. (*People v. Tylkowski* (1988), 171 Ill. App. 3d 93, 99, 524 N.E.2d 1112.) Todd, who saw defendant immediately before the shooting, said defendant seemed to be acting normal while in the apartment, and his behavior was no different shortly after the incident. The court concluded that defendant planned the shooting, as well as the post-shooting conduct and possibly the groundwork for an insanity defense. (See *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 34-35, 535 N.E.2d 1001.) The circuit court's determination of defendant's sanity, therefore, was not improbable or contrary to the manifest weight of the evidence.

### III

Defendant next contends that his cross-examination of the State's expert was improperly restricted.

■ In criminal proceedings, the scope of cross-examination is determined by the circuit court, whose decision will not be overturned absent an abuse of discretion resulting in manifest prejudice to defendant. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 538, 464 N.E.2d 659.) None of the instances cited by defendant constitutes an abuse of the circuit court's discretion. Defendant's cross-examination of Dr. Markos regarding his qualifications was not improperly restricted; the information which defendant sought to elicit was presented to the court through an offer of proof. Based upon the totality of his qualifications, the court found Dr. Markos qualified as an expert in forensic psychiatry, and that determination was not an abuse of discretion. (See *People v. Cole* (1988), 170 Ill. App. 3d 912, 929-30, 524 N.E.2d 926.) Further, the court sustained several of the State's objections to the cross-examination of Dr. Markos on relevance grounds.

The court did not abuse its discretion in so acting, and defendant suffered no prejudice as a result.

■ Defendant also claims that the court applied a different standard on cross-examination to the defense than it did to the prosecution. Specifically, he argues that Dr. Markos was allowed to expound upon his answer to a question which allegedly called for a "yes" or "no" answer, whereas Dr. Ciatteo was specifically instructed at one point to answer "yes" or "no." The record, however, does not show that different standards were used. At one point, the court specifically noted that "we have allowed [all the experts] to qualify their answers or say how they've evolved their answers." The court's admonishment of Dr. Ciatteo to "[j]ust listen to his question *** and answer yes or no," was not an attempt to discredit the witness or the defense in general. (See *People v. Williams* (1990), 201 Ill. App. 3d 207, 221, 558 N.E.2d 1258.) In fact, the trial judge indicated that she would strike any testimony by Dr. Markos that was unresponsive. Defendant suffered no prejudice as a result of the court's action.

Even if the circuit court erred in restricting defendant's cross-examination of Dr. Markos, that error would not have warranted reversal. There is no reasonable doubt whether defendant was prejudiced thereby or the outcome of the trial would have differed had the error not been made. See *People v. Sprawls* (1990), 205 Ill. App. 3d 337, 342, 562 N.E.2d 1065.

IV

Defendant asserts that he was not proved guilty beyond a reasonable doubt of Muriel's murder. Specifically, he claims that the State failed to prove he intended to kill Muriel.

The relevant mental state of murder is that an accused knows the acts he performs create a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2).) Defendant need not be shown to have had specific intent to kill or do great bodily harm or to have known with certainty that his acts would achieve those results; it is sufficient to show that he voluntarily and willfully committed an act, the natural tendency of which was to destroy another's life. (*People v. Bartall* (1983), 98 Ill. 2d 294, 307, 456 N.E.2d 59.) Because intent to kill or cause great bodily harm is not commonly proved by direct evidence, intent may be inferred from the character of defendant's acts and the circumstances surrounding commission of the offense. (*People v. Terrell* (1989), 132 Ill. 2d 178, 204, 547 N.E.2d 145.) Generally, when an accused intentionally uses a deadly weapon

upon his victim, it may be inferred that he intended to cause her death. *Terrell*, 132 Ill. 2d at 204.

■ Here, defendant entered the apartment brandishing a loaded revolver. He ordered Beth and Muriel into the bedroom, where they pleaded for their lives. Defendant fired three shots, one of which struck and killed Muriel. The court specifically found that defendant possessed the requisite intent to kill Muriel, even if it was transferred intent. At a bench trial, the judge weighs the evidence and draws reasonable inferences therefrom. (*People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317.) The circuit court's findings will not be overturned unless the evidence, when viewed in the light most favorable to the State, is so unreasonable or improbable that it leaves a reasonable doubt of defendant's guilt. (*People v. Pintos* (1989), 133 Ill. 2d 286, 290-92, 549 N.E.2d 344; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) At bar, there is no reasonable doubt of defendant's guilt.

V

Defendant claims that the circuit court's finding of guilty, rather than guilty but mentally ill, was against the manifest weight of the evidence.

When defendant has asserted a defense of insanity, the court may find defendant guilty but mentally ill if, considering all the evidence, the court finds beyond a reasonable doubt that defendant (1) is guilty of the offense charged, (2) was mentally ill at the time of the commission of the offense, and (3) was not legally insane at the time of the commission of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 115–3(c).) "Mental illness" is a substantial disorder of thought, mood or behavior which afflicted defendant at the time of the commission of the offense and which impaired defendant's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law. (Ill. Rev. Stat. 1985, ch. 38, par. 6–2(d).) A finding of guilty by a trier of fact will not be disturbed on appeal on the issue of mental illness absent facts indicating defendant's illness at the time he committed the offense; the court's decision will be affirmed unless the determination is so improbable or unsatisfactory as to raise a reasonable doubt of defendant's sanity. *People v. Wiley* (1989), 185 Ill. App. 3d 1097, 1106, 541 N.E.2d 1345.

Defendant relies on *People v. Gurga* (1986), 150 Ill. App. 3d 158, 501 N.E.2d 767, in which defendant was convicted of murder, attempted murder, and home invasion (Ill. Rev. Stat. 1981, ch. 38, pars.

8—4(a), 9—1(a), 12—11(a)), having failed to sustain his insanity defense. The appellate court concluded that he should have been found guilty but mentally ill because he had an extensive history of emotional problems documented by numerous psychiatrists. Further, the State's expert, as well as defendant's, submitted considerable evidence showing that defendant suffered from a substantial disorder of mood or behavior which impaired his judgment. Based upon that evidence, the court reversed defendant's conviction and remanded for entry of a judgment of guilty but mentally ill. *Gurga*, 150 Ill. App. 3d at 166-68.

■ Here, however, the court determined that defendant "at best *** may have had a mental defect amounting to a personality disorder"; his condition, however, did not rise to the level of a mental illness that deprived him of all rational thought. Defendant here had no history of emotional or psychological problems or treatment. The court also concluded that defendant was shown to be goal-oriented and had planned the shooting. The fact that Dr. Markos' testimony contradicted that of defendant's experts does not authorize this court to overturn the findings of the trier of fact. (See *People v. Reed* (1991), 209 Ill. App. 3d 575, 582, 568 N.E.2d 334, *appeal denied* (1991), 139 Ill. 2d 602.) The determination of defendant's guilt, therefore, was not so improbable as to raise a reasonable doubt of his sanity.

## VI

Defendant asserts that the guilty but mentally ill statute is unconstitutionally vague. Contrary to the State's assertion, defendant has not waived this issue for failure to include it in his post-trial motion, as a constitutional challenge to a statute can be raised at any time. *People v. Bryant* (1989), 128 Ill. 2d 448, 454, 539 N.E.2d 1221.

■ The constitutionality of the guilty but mentally ill statute has been upheld several times on various grounds. (See *People v. Seaman* (1990), 203 Ill. App. 3d 871, 884-89, 561 N.E.2d 188, *appeal denied* (1990), 135 Ill. 2d 564; *People v. Fields* (1988), 170 Ill. App. 3d 1, 6-7, 523 N.E.2d 1196, *appeal denied* (1988), 122 Ill. 2d 583; *People v. Martin* (1988), 166 Ill. App. 3d 428, 435, 519 N.E.2d 1085; *People v. Carter* (1985), 135 Ill. App. 3d 403, 414-16, 481 N.E.2d 1012; *People v. Smith* (1984), 124 Ill. App. 3d 805, 807-13, 465 N.E.2d 101; *People v. DeWit* (1984), 123 Ill. App. 3d 723, 733-39, 463 N.E.2d 742.) Defendant offers no new arguments to warrant deviation from those precedents.

## VII

Defendant lastly argues that his sentence of natural life imprisonment is excessive. Defendant has waived this argument for failure to file a post-sentencing motion specifically alleging such error. *People v. Diaz* (1989), 189 Ill. App. 3d 473, 476, 545 N.E.2d 399.

■ Nevertheless, were we to consider defendant's argument, it would fail. Section 5—8—1 of the Unified Code of Corrections provides that a defendant found guilty of murdering more than one victim shall be sentenced to a term of natural life imprisonment. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c); see also *People v. Winchel* (1987), 159 Ill. App. 3d 892, 923, 512 N.E.2d 1298.) Further, even if defendant was found guilty but mentally ill, he would remain eligible for natural life imprisonment. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—6(a); *People v. Crews* (1988), 122 Ill. 2d 266, 278, 522 N.E.2d 1167.) Although defendant qualified for imposition of the death penalty, the court determined that the mitigating factors outweighed those presented in aggravation, and instead imposed the natural life prison sentence. That sentence, made mandatory by statute, is not excessive.

Because the circuit court applied an improper standard of proof to the evidence of defendant's insanity, we reverse his convictions for murder and remand for a new trial.

Reversed and remanded.

DiVITO and McCORMICK, JJ., concur.