FOURTH DIVISION

SEPTEMBER 30, 2003

1-00-2755

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

      ) 

v. ) No. 99 CR 6687

)

ABEL COLIN, ) Honorable

) John J. Moran,

Defendant-Appellant. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court:

Following a jury trial, defendant, Abel Colin, was convicted on two counts of aggravated criminal sexual assault (720 ILCS 5/12-14(A)(2) (West 1994)) and sentenced to two consecutive 60-year terms in custody of the Illinois Department of Corrections.  Defendant appeals, arguing (1) the circuit court erred in admitting other-crimes evidence involving him in a prior sexual assault; and (2) his sentence is unconstitutional under 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000) (
Apprendi
).  Defendant's conviction and sentencing are affirmed.

Prior to trial, the State moved 
in
 
limine
 
to present evidence of other crimes to establish defendant's 
modus
 
operandi
,
(footnote: 1) claiming  sufficient similarities between the assaults of H.R., a previous victim, and S.F., the complainant in this case, which made the other-crimes evidence admissible.  The State argued that in both cases, the victims were young, vulnerable females, who knew defendant and his wife, Stephanie Colin (Stephanie), as neighbors.  The State emphasized that defendant and Stephanie were a husband and wife team that worked together to get their victims alone.  Once alone, Stephanie restrained the victims while defendant sexually assaulted them, and threatened them with physical harm.  Both victims complained about being sexually violated.

The defense responded that evidence of the sexual assault of H.R. could not be admitted as other-crimes evidence because:  (1) although defendant was charged only with sexual assault he pled guilty and was convicted of aggravated kidnapping with respect to H.R.;
 (2) the other-crimes evidence could not establish defendant’s 
modus
 
operandi
 be
cause the two crimes were not sufficiently unique; and (3) the prejudicial effect of this evidence outweighed its probative value.

The circuit court admitted the other-crimes evidence, noting "the facts of the two cases are stunningly similar to each other," and ruled that its probative value outweighed its prejudicial effect.  The court did not limit the evidence to defendant’s plea of guilty to aggravated kidnapping, but found the entire case involving H.R. admissible.

There was evidence that between 1993 and 1995, S.F., who was then six to eight-years-old, was orally assaulted and vaginally raped, sodomized and tortured by defendant on a daily basis with the aid and abetment of his wife, Stephanie.  S.F., 13-years-old at the time of trial, testified she was six-years-old in 1993 and began kindergarten.  Defendant and Stephanie lived two houses away and were friendly with S.F.'s family, her father having been godfather to one of defendant's five children.  S.F.’s mother began work at 6:00 a.m. and her father worked nights.  Stephanie began babysitting for S.F.  She and defendant routinely drove S.F. to school in their van.

S.F. testified she dressed herself before school each morning.  Stephanie arrived at S.F.’s home and brought her back to the Colins’ home, where Stephanie took S.F. to defendant’s bedroom, or the basement, which the Colins fixed up with a bed, toys and an Easy-Bake oven.
  Before going to the bedroom, Stephanie took S.F. to the second-floor bathroom, removed S.F.’s clothing and "cleaned" her vagina using a hose attached to the bathroom sink.  Once "clean," Stephanie took S.F., who was naked, into the bedroom where defendant was waiting; sometimes being naked himself.  Defendant would tell S.F. to get on the bed, and he would fold a large pillow, placing it behind S.F.’s back for her to lie on.  She would open her legs and defendant would put his penis in her vagina and "move up and down" until a "white thing," sperm, came out, which defendant referred to as "milk."  He used various slang terms for penis and vagina that S.F. never had heard before.  Defendant taught her the words.  Afterwards, defendant would make S.F. suck on his penis and drink his ejaculate.  Sometimes S.F. would attempt to resist and bite defendant’s penis.  Defendant at times used a "fake penis" in S.F.’s mouth to make her mouth bigger so she would not bite his penis.  

At times defendant wanted S.F. brought to the basement and, on these days, Stephanie would not "clean" her vagina.  Defendant would tell S.F. to take her clothes off.  Occasionally she would resist by untying and retying her shoes, so defendant would have less time to be with her, but these attempts never worked.  Defendant did the same things to S.F. in the basement as he did in his bedroom.  Defendant kept a baseball bat and a knife next to a makeshift bed in the basement and told S.F. if she screamed, which she once tried to do, he would stick the bat into her vagina or cut her.  Defendant told her he could hurt her or her family and, since her parents were going through a divorce at the time, he threatened that she would have to live with the Colins.  After defendant’s attacks upon S.F., he and Stephanie would drive her to school.  Then, in the afternoon, they would pick her up from school, and the violations would again take place.  On some afternoons, defendant would urinate in a plastic pink cup he kept in a nearby drawer and force S.F. to drink his urine.

S.F. testified that, occasionally, defendant would bring her into the bedroom of his teenage son, Anthony.  There, Anthony would put his penis in her vagina while defendant put his penis in her mouth.  Sometimes, defendant and Anthony swapped positions.  "Milk" would come out of Anthony’s penis.  Later in the course of the sexual assaults, defendant would put his penis in her anus.  After he first started doing this, he did it everyday.  As  time went on, S.F. spent more and more time at the Colins’ house.  It was Stephanie’s idea for S.F. to eat dinner there, visit on weekends and sleep overnight.  Stephanie would go to S.F.’s house to bring S.F. to her home, but when her family wanted her to stay home, Stephanie would beg the family, telling them that she wanted S.F. to play with her daughters.  Stephanie would also wash S.F.’s clothes and not return them.

S.F. testified that Stephanie’s role in helping defendant grew during the course of the sexual assaults.  Early on, Stephanie would remain in the room to clean or put things away, and would watch defendant sexually assault S.F.  Later, she would aid defendant by grabbing S.F.’s legs while defendant put his penis in her vagina.  Stephanie would also untie S.F.’s shoes when S.F. tried to stall as she was getting undressed.

S.F. stated that in October of 1994, defendant made tape recordings involving S.F., where he would tell her exactly what to say:  that she went out late at night to see "gangbangers," who put their penises in her vagina.
  On the tape, S.F. also stated she had sex with a man named Martin and other fictitious people. S.F. denied having sex with "gangbangers" and made the tape only by reason of defendant's force.

Defendant sexually assaulted S.F. for the last time on February 6, 1995.  Two days later, S.F. went to the hospital accompanied by her mother and Stephanie, with defendant driving them.  Stephanie, who was carrying a pair of S.F.’s underwear in a bag, told a nurse that a man named Martin, a "gangbanger," had touched S.F. and cut her vagina with a knife.  S.F. relayed the same story to a female police officer.  S.F. was examined by a physician, to whom Stephanie told the fabricated story.  S.F. did not remember whether her mother was present during the various conversations at the hospital, or not. 

When S.F. and her mother were in the privacy of their own home, S.F.’s mother asked S.F. to tell the truth about who really touched her, and S.F. replied it was defendant.  

     On cross-examination, S.F. testified that during the entire time she was sexually assaulted, she never told her teachers, sisters, brothers or her parents.  She admitted that she told various stories of how she had been abused to hospital personnel, but could not remember any of the details she told the nurse.  She did not remember the stories she told to the examining doctor, the detective or the social worker.  S.F. stated she was made to drink defendant’s urine between 5 to 10 times and, afterwards, she would try to vomit.

S.F.’s older sister, N.F., testified that Stephanie came to their house almost every morning to pick up S.F., but S.F. never went to the Colins’ home on her own.  N.F. stated that her other younger sister, whose initials are also N.F., was supposed to pick up S.F. from school, but at some point Stephanie began picking up S.F. before 
her sister would arrive.  As time when on, S.F. was spending an increasing amount of time with the Colins, but their daughters would never go to S.F.’s house to ask for her.  N.F. stated there were occasions when she knew the Colins were home and would go to their house looking for S.F. and no one would answer the door, but she would see Anthony look out the window.  Other times, the Colins would answer the door, but say S.F. was not there.  N.F. also testified that she would frequently notice a smell about S.F. when she arrived home; her clothes were "stinky" and her mouth smelled.  N.F. denied that S.F. would sneak out at night.

S.F.’s mother, P.F., testified through an interpreter and reiterated how defendant and Stephanie became involved with S.F.  On February 8, 1995, P.F. went to the Colins’ house and found Stephanie there with S.F.  Stephanie told P.F. that there was blood in S.F.’s underwear and that Martin had violated her, which prompted P.F. to take her daughter to the hospital.  Stephanie said, "[n]o.  No. I will go with you."  Stephanie spoke to the nurse at the hospital and translated for P.F.  Once P.F. learned what had actually happened from S.F., she went to the police station and made a report.

Stephanie, defendant’s wife and co-defendant, also testified for the prosecution.  She admitted she plead guilty to aggravated criminal sexual assault for her involvement in the assaults of S.F. and was currently serving a 23-year sentence.  Stephanie testified she, defendant and their five children were neighbors of  S.F.  She confirmed the details of how she became involved with S.F., stating that she would bring S.F. over to play with her daughters.  When questioned about defendant’s assault of S.F., she denied ever witnessing the assaults and any knowledge thereof.  

Stephanie was confronted with a statement she had given on February 10, 1995, written out by Assistant State’s Attorney Laura Forrester.  Although Stephanie admitted she signed the statement numerous times, she denied almost every assertion in her statement including: (1) she saw defendant "make love" to S.F.; (2) defendant told her to bring S.F. to him or he would leave her; (4) when S.F. came over in the morning before school, Stephanie would bring S.F. to defendant so he could have sex with her; (5) she helped S.F. get undressed and dressed; (6)  defendant would have sex with S.F. in the afternoon; (7) sometimes she would help defendant by holding S.F.’s legs apart; and (8) defendant made up the story that "gangbangers" sexually assaulted her and cut her vagina with a knife.  As to the tape recording, Stephanie testified it was S.F.’s idea to make it so her mother would believe the "gangbanger" story and that S.F. told her that "gangbangers" called her downstairs, cut her vagina with a knife and had sex with her.

Detective Edmund Mook testified that on February 8, 1995, he was assigned to investigate the sexual assault of S.F.  Mook spoke with defendant at the police station later that night and defendant denied sexually assaulting S.F.  Defendant, however, told Mook about his prior conviction in a previous similar incident.  Defendant explained he had been arrested in 1987 for the sexual assault of a 13-year-old girl.

In establishing defendant’s
 
modus
 
operandi
, the State introduced other-crimes evidence through the following testimony: H.R., the victim of a 1987 sexual assault involving defendant; Detective Robert Collins; Assistant State’s Attorney (ASA) Demetrios Kottaras; and Stephanie Colin.  The State also used Stephanie’s 1987 handwritten statement and a statement taken from defendant at the time of that arrest.

H.R., who was 26 at the time of trial, testified that in 1987 she was sexually assaulted by defendant when she was 13 years-old.  She has a learning disability and attended slow learning disability classes.  The Colins were her neighbors and she played with their children.  H.R. recounted that on January 24, 1987, H.R. was at a laundromat by herself doing the family’s laundry.  The Colins asked her to take a ride.  H.R. refused.  The Colins begged her to go with them, which she eventually did because she was scared.  H.R. got inside the Colins’ van which they drove to an alley behind a building where they stopped the van.  Stephanie gave her a pill that made her drowsy, and told H.R. to lie down on the bed.  The next thing she knew,  Stephanie was holding her arms down as defendant raped her vaginally.  They told her to get dressed and dropped her off at the laundromat.  Almost a week later on February 2, 1987, she told her teacher, who notified her mother and the police.

Detective Collins testified as to Stephanie’s statement taken subsequent to her arrest in February of 1987, in connection with the assault of H.R.  Stephanie told him she had known H.R. for about four years and that she and defendant picked up H.R. at the laundromat and were driving around in the van with her until they stopped on a side street.  They went to the back of the van where there was a bed and H.R. took her clothes off.  Stephanie said she gave H.R. a birth control pill and sat next to  H.R. as defendant had vaginal intercourse with her.

Detective Collins also testified regarding defendant’s statement to him.  Defendant stated H.R. called him and asked him to pick her up from the laundromat.  Once in the van, H.R. told defendant she wanted to have sex with him, so Stephanie gave H.R. a birth control pill.  H.R. then reached into defendant’s pants and pulled out his penis, after which defendant took off her underwear.  Defendant had sex with H.R. and then dropped her off at the laundromat.

ASA Kottaras testified that Stephanie gave a statement to him about the incident with H.R.  Through Kottaras, Stephanie’s statement was published to the jury, wherein Stephanie gave a similar account of the events she had given to Collins.  Stephanie’s statement read, in part:

"They [defendant and H.R.] made love without any force by Abel or Stephanie. [H.R.] and Abel have made love before in the van 
just like
 on Saturday, January 24.  They would 
usually meet
 [H.R.] at the laundromat.  On this particular day[,] 
as well as others times[,]
 Mrs. Colin would give [H.R.] a birth control pill before her husband and [H.R.] would make love.  Mrs. Colin told [H.R.] the pill was so that [H.R.] would not get pregnant.  After the two made love they [defendant and Stephanie] dropped [H.R.] off at the laundromat."  (Emphasis added.)

At the conclusion of evidence, a jury found defendant guilty of two counts of aggravated criminal sexual assault.  After hearing aggravation and mitigation evidence, the circuit court sentenced defendant to two consecutive terms of 60 years in custody of the Illinois Department of Corrections.

I

Defendant first contends that the circuit court erred in admitting evidence of defendant's prior sexual assault of H.R. because of insufficient similarities between the two offenses. 

Generally, evidence of other crimes is not admissible for the purpose of showing defendant's disposition or propensity to commit crime.  
People v. Illgen
, 145 Ill. 2d 353, 364-65, 583 N.E.2d 515 (1991) (
Illgen
), but is admissible to prove 
modus
 
operandi
, intent, identity, motive or absence of mistake.
(footnote: 2)  
People v. McKibbins
, 96 Ill. 2d 176, 182, 449 N.E.2d 821 (1983)
.  
Modus
 
operandi
 or "method of working," refers to a pattern of criminal behavior so distinct that separate crimes are recognized as the work of the same person.  
People v. Kimbrough
, 138 Ill. App. 3d 481, 486-87, 485 N.E.2d 1292 (1985)
.  If evidence of other crimes is offered to prove
 
modus
 
operandi
, there must be some clear connection which creates a logical inference that if defendant committed the former crime, he may have committed the crime charged.  
Kimbrough
, 138 Ill. App. 3d at 486.
  Accordingly, there must be distinctive features that are not common to most offenses of that type.  
People v. Dickerson
, 119 Ill. App. 3d 568, 574, 456 N.E.2d 920 (1983) (
Dickerson
).

Although there must be a "strong and persuasive showing" of similarity between the crimes, "it is not necessary that the crimes be identical" for the other crime to be admitted into evidence to prove 
modus
 
operandi
.  
People v. Williams
, 185 Ill. App. 3d 840, 853, 541 N.E.2d 1175 (1989) (
Williams
).   Where common features may be insufficient to raise the inference of 
modus
 
operandi
 on an individual basis, the combination of such features may reveal a distinctive combination so as to suggest the work of the same person.  
People v. Smith
, 236 Ill. App. 3d 1060, 1063, 602 N.E.2d 1388 (1992) (
Smith
).  The test is not one of exact, rigorous identity, as some dissimilarity will always exist between independent crimes (
People v. Phillips
, 127 Ill. 2d
 499, 521, 538 N.E.2d 500 (1989)); rather, it is the similarity of the conduct as a whole, not the uniqueness of any single factor, which is the key to establishing 
modus
 
operandi
.  
Smith
, 236 Ill. App. 3d at 1063.
  The determination as to the admissibility of other crimes evidence rests within the sound discretion of the circuit court and will not be disturbed absent its abuse.  
People v. Robinson
, 167 Ill. 2d 53, 63, 656 N.E.2d 1090 (1995) (
Robinson
).  

In 
People v. Bayer
,
 160 Ill. App. 3d 218, 513 N.E.2d 457 (1987) defendant was charged with sexually assaulting his stepdaughter between the ages of 9 and 12.  Evidence of defendant's prior sexual assault of a different young girl was held properly admitted to prov
e 
modus
 
operandi
 because both girls were about the same age, they performed similar acts of oral sex on defendant, defendant took photographs of both girls, and he made threats to prevent disclosure of the assaults.  
Bayer
, 160 Ill. App. 3d at 221
.

Similarly, in 
People v. Uzelac
, 179 Ill. App. 3d 395, 534 N.E.2d 1250 (1988) defendant argued that the circuit court improperly admitted evidence of a prior attempted rape under the 
modus
 
operandi
 exception because of the many differences between the two crimes.  
The court held that the circuit court properly admitted evidence of the prior offense despite some differences because "the differences were inconsequential in comparison to the similarities common to both crimes."  
In so ruling, the court noted particularly that defendant was positively identified in court as the assailant in both attacks.  
Uzelac
, 179 Ill. App. 3d at 406.

Finally, in 
Smith
, the court held that the circuit court abused its discretion by excluding evidence of defendant's prior sexual assaults on the basis that the prior attacks did not possess any distinctive features uncommon to most offenses of that nature.  
Smith
, 236 Ill. App. 3d at 1061.  There, in the crime charged, defendant had not even sexually assaulted the victim but had done so during the prior attacks.  
In reversing the circuit court, the 
Smith
 court acknowledged the differences in the cases but stated, "[s]uch dissimilarities could not justify excluding evidence of the other two offenses."  
Smith
, 236 Ill. App. 3d at 1064. 

In the case at bar, sufficient similarities existed between the offense charged and the prior offense involving H.R. to warrant the circuit court's admission of other crimes evidence.  When the facts of these cases are considered together and in their entireties, the similarities between defendant's conduct toward S.F. and his crime against H.R. plainly outweigh the differences.  See 
Williams
, 185 Ill. App. 3d at 855. 
 

In both cases, defendant selected his victims using virtually identical criteria.  The victims, S.F. and H.R., were vulnerable, young girls.  S.F. was vulnerable to attack since she was so young, and H.R. had a "slow" learning disability.  They each knew and were neighbors of the Colins. 
 The families of each victim were friends of the Colins.  They each allowed their daughters ostensibly to play with the Colins's children at their home. 

Defendant's strategy in seducing the victims was strikingly similar in each case.  Defendant's technique was to act in concert with his wife, Stephanie, to procure the young girls for him.  In both cases, Stephanie exploited her position of trust as a neighbor and mother to lure the victims into perilous situations.  Stephanie's role, however, did not end there.   

In each case, Stephanie not only viewed, but participated in defendant's sexual assaults.  In the case of H.R., Stephanie "prepared" H.R. to be sexually assaulted by first giving her a pill that made her drowsy.  Then, she subdued H.R. by holding down H.R.'s arms while defendant removed her clothes and put his penis inside her vagina.  Stephanie was present and observed as defendant sexually assaulted H.R.  Here, Stephanie "prepared" S.F. by first washing her vagina with water, and then bringing her to defendant so he could violate her.  She would hold S.F.'s legs open while defendant put his penis inside her vagina.
(footnote: 3)  Again, Stephanie was present and observed as defendant sexually assaulted S.F.  Finally, in describing each instance Stephanie referred to the sexual assaults as defendant and the victim "making love." 

The overall similarities between the sexual assaults of H.R. and S.F. support the propriety of the circuit court's admission into evidence of defendant's prior sexual assaults.  The similarities sufficiently justified the inference that both victims were sexually assaulted by defendant.  See 
Robinson
, 167 Ill. 2d at 65.  Significantly, because defendant used his wife in procuring both victims, "preparing" them and in physically aiding him in accomplishing the assaults, the two crimes contain distinctive features not common in most offenses of that nature.  See 
Dickerson
, 119 Ill. App. 3d at 568.  Inevitable incongruities may exist among the two offenses; however, these differences are inconsequential when the similitudes of defendant's conduct are considered as a whole.  See 
Smith
, 236 Ill. App. 3d at 1063.  The finding of the circuit court, "that the facts of the two cases are stunningly sufficiently similar to each other" and are admissible to establish defendant'
s 
modus
 
operandi
, is well supported by the evidence.  The court did not abuse its discretion in admitting the  other crimes evidence.

Defendant's argument, that even if the circuit court properly admitted other crimes evidence to establish
 
modus
 
operandi
, the prejudicial impact of the evidence outweighed its probative value, therefore depriving him of a fair trial, also lacks sufficient evidentiary support.
(footnote: 4)  

The circuit court must weigh the relevance of the evidence to establish the purpose for which it is offered against the potential undue prejudice.  
People v. Thingvold
, 145 Ill. 2d 441, 452, 584 N.E.2d 89 (1991) (
Thingvold
).  Whether the probative value of the evidence is outweighed by its undue prejudicial effect is within the sound discretion of the circuit court which will not be reversed absent its clear abuse.  
Illgen
, 145 Ill. 2d at 375. 

Defendant argues that evidence of other crimes ran rampant throughout his trial and "[t]he State exploited this other crimes evidence excessively."  He points to possible instances of error where other-crimes evidence pervaded the trial, namely through the in-court testimony of: H.R., who testified that defendant sexually assaulted her in 1987; Detective Collins, who testified that Stephanie confessed in 1987 to defendant's assault of H.R.; ASA Kottaras, through whose testimony Stephanie's 1987 handwritten statement was published to the jury; and Detective Mook, to whom defendant admitted sexually assaulting H.R. in 1987 when he was arrested for the assault of S.F.  Defendant further complains the assault of H.R. was "predominantly" mentioned during closing argument, leaving the jurors with the impression that defendant's assault of H.R. was "part and parcel" of S.F.'s assault.  Allegedly, the result of the continuous focus on H.R.'s assault, defendant contends, developed into a "mini-trial" and the details presented to the jury exceeded that which was necessary to show defendant's 
modus
 
operandi
. 

Ordinarily, the admission of other-crimes evidence, although relevant, does not justify a "mini-trial" of a collateral offense.  
People v. Aleman
, 313 Ill. App. 3d 51, 65, 729 N.E.2d 20 (2000).  The evidentiary details should be limited to those necessary to illuminate the issue for which the other crime was introduced.   
People v. Bartall
, 98 Ill. 2d 294, 315, 456 N.E.2d 59 (1983).  Where an explanation or description of circumstances surrounding defendant's other crimes becomes difficult without introducing  evidence concerning the other crimes, however, then relevant, detailed evidence of the other crimes is admissible to the extent necessary to fulfill the purpose for which the evidence is being admitted.  
Kimbrough
, 138 Ill. App. 3d at 489.
  Here, evidence of defendant's prior sexual assault of H.R., although prejudicial, clearly was probative and relevant, and detailed only to the extent necessary to demonstrate defendant's 
modus
 
operandi
.  The record demonstrates that the circuit court balanced the other-crimes evidence and found it more probative than prejudicial: "[t]he court finds that the probative value outweighs the prejudice to defendant.  So this evidence will be allowed.  It will not be limited only to the plea of guilty on the kidnapping[,] but will be allowed on the entire action involving the victim in the case from 1987."

In her opening statement, the prosecutor told the jury that evidence relating to H.R.'s assault was important to show that defendant and his wife were guilty in this case since "they have a certain 
modus
 
operandi
."  She stated the similarities between the two crimes were "a virtual fingerprint of guilt."  The State called Stephanie Colin and briefly questioned her about her role in H.R.'s assault.  Stephanie admitted pleading guilty to aggravated kidnapping in connection with H.R.'s case, but could not recall a statement she gave to ASA Kottaras in 1987, denied giving the statement, and denied the veracity of its substance. 

Of 12 witnesses called by the State, only three offered testimony to establish exclusively defendant's prior assault of H.R.  
One witness was H.R., who identified defendant and testified in abbreviated detail about defendant's sexual assault of her in 1987
.  Next, testimony given by Detective Collins and ASA Kottaras, both involved in H.R.'s case, was required to impeach Stephanie's in-court denial and failure to recall defendant's sexual assault of H.R.  Through this evidence, Stephanie's statement was published to the jury to prove her knowledge of and involvement in H.R.'s assault.  Despite defendant's assertion that the assault of H.R. differed from that of S.F. because it was a one-time incident, Stephanie's 1987 statement, previously quoted above, contradicts defendant and reveals his multiple sexual violations of her.
(footnote: 5)  Furthermore, because 
modus
 
operandi
 was at issue in this matter and defendant plead guilty to kidnapping H.R. but not her sexual assaults with which he was charged, the State necessarily had to delve in sufficient detail of H.R.'s assaults to establish the similarities to the present charged offense.  See 
People v. Bragg
, 277 Ill. App. 3d 468, 477, 659 N.E.2d 1378 (1995).

Defendant maintains that Detective Mook's testimony was excessive and non-probative.  Prior to Mook's testimony, the circuit court pre-instructed the jury about other-crimes evidence, stating that such evidence was only to be considered for the limited purpose of showing 
modus
 
operandi
.  Mook recounted defendant's admission that he sexually assaulted H.R. when he was arrested for the assault of S.F.  Considering the highly limited detail of the testimony and the narrow purpose for which it was offered, the court did not abuse its discretion in allowing this testimony. 

Lastly, defendant takes issue with the prosecutor's comments during closing argument where she referred to the similarities between defendant's assault of H.R. and S.F., the prosecutor stating, "[l]et's look at [H.R.] for a minute.  The only reason you are able to hear evidence about her is to explain some issues, and Laura [an assistant state's attorney] told you about them in opening statement, 
modus
 
operandi
.  It's a virtual fingerprint, their method of operation, how they do things. ***  And was this the same method of operation?  Absolutely."  The prosecutor described H.R.'s assault, highlighted the similarities between H.R. and S.F. as victims, and emphasized Stephanie's integral role in procuring both victims for defendant.  The prosecutor also argued that defendant and Stephanie learned from H.R.'s assault to be more successful in the future sexual assaults.

In rebuttal closing argument, the prosecutor reiterated the facts of H.R.'s assault and characterized the girls as very similar victims.  The prosecutor tempered the prejudicial nature of the comparisons by stating, "[t]he evidence [of H.R.'s assault] was introduced because those cases are so remarkably similar that it is his [defendant's] fingerprint of guilt, as if there was a fingerprint on this case." 

The record demonstrates that the circuit court and prosecution made considerable efforts to ensure that the jury was aware of the limited purpose for introducing evidence of defendant's prior sexual assault.  The prosecutors consistently told the jury in what respect defendant's assault of H.R. was relevant, and the judge specifically instructed the jury that the evidence regarding H.R.'s assault could be considered for the sole and limited purpose of establishing defendant's 
modus
 
operandi
.
(footnote: 6)  Although the State's somewhat repetitious references to H.R.'s assault in closing argument cannot be approved, and is discouraged, it was not of such magnitude as to warrant reversal.  
See 
People v. Cortes
, 181 Ill. 2d 249, 285, 692 N.E.2d 1129 (1998).  The State's repeated pronouncement of the 
modus
 
operandi
 exception along with the court's limiting instruction substantially reduced any undue prejudicial impact which may have resulted by virtue of the admission of such evidence.  See 
People v. Wolfbrandt
, 27 Ill. App. 3d 836, 846, 469 N.E.2d 305 (1984).  Faith in the ability of a properly instructed jury to separate issues and reach a correct result is the cornerstone of the jury system.  
Illgen
, 145 Ill. 2d at 376.
(footnote: 7)
 Under all the circumstances in this case, especially as they relate to defendant's 
modus
 
operandi
,
 the probative value of H.R.'s assault was not outweighed by undue prejudice.  Any untoward mention of H.R.'s assault in the State's closing argument cannot be said to have been a material factor in defendant's conviction. 

II

Defendant’s final argument on appeal is that his two consecutive extended term 60-year sentences are unconstitutional under the holding of 
Apprendi
.  Defendant argues the circuit court’s findings supporting the extended term sentences were not alleged in the indictment, nor were the issues submitted and considered by the jury.
 

In imposing defendant’s extended term sentences, the circuit court specifically found that "the behavior of defendant was exceptionally brutal or heinous indicative of wanton cruelty."  See 730 ILCS 5/5-3.2(b)(2)(West 2000).  The court also found that more than one offender participated in the sexual assaults; defendant’s wife, Stephanie, participated in the planning and execution of the acts, and defendant’s son, Anthony, was also a participant.  See 730 ILCS 5/5-5-3.2(b)(5) (West 2000).
  The circuit court did not specify which of the two grounds upon which it was imposing the extended term sentences.
(footnote: 8)
 The State correctly asserts that defendant has waived review of this issue, not having objected at the sentencing hearing (
People v. Smith
, 257 Ill. App. 3d 252, 254, 628 N.E.2d 960 (1993)), nor did he specifically allege such error in his post-sentencing motion.  
People v. Kluxdal
, 225 Ill. App. 3d 217, 229, 586 N.E.2d 701 (1991)
.  Defendant had the opportunity, which he chose not to exercise, to raise his 
Apprendi
 challenge before the circuit court.  Defendant was sentenced and filed a motion for new trial on June 6, 2000, prior to 
Apprendi
, which was decided on June 26, 2000.  Defendant, however, moved to reduce his sentence on July 10, 2000, after 
Apprendi
, but failed to include his 
Apprendi
 challenge in that motion.  Therefore, defendant has waived this issue.  Nevertheless, we elect to address the merits of defendant’s claim of error under 
Apprendi
.

The issue becomes whether the 
Apprendi
 violation constitutes plain error.  In 
People v. Crespo
, 203 Ill. 2d 335, 788 N.E.2d 1117 (2003) (
Crespo
) the Illinois Supreme Court determined that defendant’s extended term sentence, imposed on the basis of the "brutal or heinous" nature of the offense, violated 
Apprendi
.  
The court held, however, that the error did not amount to plain error because there was "no doubt that a jury, presented with these facts, would have found that the crime was committed in a brutal and heinous manner."  
Crespo
, 203 Ill. 2d at 348-9.     

In the case
 
sub
 
judice
, no doubt the jury would have found that defendant’s ongoing two-year sexual ravaging of an infant such as S.F. was brutal and heinous.  As we recently stated in 
People v. Gholston
:

"[I]t is contrary to human experience and reason that the conduct involved in this case should be placed into the technical reservoir of requiring a new sentencing hearing solely for the purpose of attaching a label of 'brutal and heinous' to the conclusion earlier reached by the factfinder.  Surely these facts would be recognized by any rational and reasonable person as requiring an enhanced sentence."  
People v. Gholston
, 332 Ill. App. 3d 179, 772 N.E.2d 880 (2002) (
Gholston
). 

On the record before us, there is no basis for concluding that any error seriously affected the fairness, integrity or public reputation of the judicial proceedings.  
Crespo
, 203 Ill. 2d at 348; 
Gholston
, 332 Ill. App. 3d at 188, citing 
United States v. Cotton
, 535 U.S. 625, 632-3,152 L. Ed 2d 860, 122 S. Ct. 1781 (2002).

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed and defendant’s extended term sentences are affirmed.

Affirmed.

HARTMAN, J., with GREIMAN and KARNEZIS, JJ., concurring

FOOTNOTES
1:
The State argued other-crimes evidence was relevant and admissible to prove identity, and common design or scheme at trial, later focusing on the evidence under the 
modus
 
operandi
 
exception, which the State argues also on appeal. 

2:
"Other-crimes" evidence does not pertain solely to prior convictions; the term encompasses prior bad acts (
Illgen
, 145 Ill. 2d at 365) as well as subsequent acts (
People v. Bartall
, 98 Ill. 2d 294, 312-13, 456 N.E.2d 59 (1983) (
Bartall
)), where the standard for admissibility of such evidence is more than mere suspicion, but less than beyond a reasonable doubt.  
Wernowsky v. Economy Fire & Casualty Co.
, 106 Ill. 2d 49, 55 (1985), 
Huddleston v. United States
, 485 U.S. 681, 689, 99 L. Ed. 2d 771, 108 S. Ct. 1496 (1988). 

3:
In addition to vaginal intercourse, at various times between 1993 and 1995 defendant also forced S.F. to engage in sodomy and fellatio.  In 
People v. Bullock
,
 
modus
 
operandi
 was established although defendant engaged in anal intercourse with one victim and vaginal intercourse with the other.  
People v. Bullock
, 154 Ill. App. 3d 266, 507 N.E.2d 44 (1987).

4:
At the outset we note that defendant did not specifically include this claim in his post-trial motion.  
People v. Lindsey
, 201 Ill. 2d 45, 772 N.E.2d 1268 (2002).  The failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal.  
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).  Waiver, however, limits the parties' ability to raise an argument, not this court's right to entertain an argument.  
People v. Kliner
, 185 Ill. 2d 81, 127, 705 N.E.2d 850 (1998).  For this reason, the merits of defendants' claim will be addressed.

5:
During the pre-trial hearing on the State’s motion to admit evidence of H.R.’s sexual assault
, the court asked whether H.R. had been assaulted more than once.  The State twice informed the court that defendant sexually assaulted H.R. "on numerous occasions."

6:
The court instructed the jury specifically: "Evidence has been received that the defendant has been involved in an offense other than those charged in the indictment.  This evidence has been received on the issues of the defendant's intent, motive, design, knowledge, 
modus
 
operandi
, and absence of innocent state of mind and may be considered by you only for that limited purpose.  It is for you to determine whether the defendant was involved in that offense, and if so what weight should be given to this evidence on the issues of intent, motive, design, knowledge, 
modus
 
operandi
, and absence of innocent state of mind."

7:
Nonetheless, as previously suggested, prosecutors must be more circumspect in sensitive situations of other-crimes evidence.  Where such evidence is properly admitted for the limited purpose of demonstrating defendant's 
modus
 
operandi
, there is no need for the prosecution to belabor details of other crimes when sufficient evidence of the prior offense has been revealed to the jury adequately.

8:
Defendant’s sentencing can be affirmed by mandate of statute alone.  The circuit court did not, but could have based defendant’s extended term sentences solely on the fact that defendant was convicted of aggravated criminal sexual assault of a child under 18-years-old.  See 730 ILCS 5/5-5-3.2 (West 2000) ("[t]he court may impose an extended term sentence *** upon any offender who was convicted of aggravated criminal sexual assault *** where the victim was under 18 years of age at the time of the commission of the offense").  We note that 
Apprendi
 would have no bearing on an extended term sentence based on the preceding statutory authority.