(No. 15484.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* OSCAR DECKER *et al.* Plaintiffs in Error.

*Opinion filed December 19, 1923.*

1. CRIMINAL LAW—*when instruction is misleading where there are several defendants.* Where several defendants are indicted, an instruction that to warrant a conviction the jury is "only required to believe from the evidence, beyond a reasonable doubt, that the defendants, or any one or more of them, committed the crime as charged in the indictment," is misleading.

2. SAME—*instruction that defendants may be convicted by "secondary" evidence is improper.* An instruction that the guilt of the defendants may be proved by secondary or circumstantial evidence, either in whole or in part, if the entire evidence introduced is of such a character that it dispels all reasonable doubt as to the guilt of the accused, is objectionable in the use of the word "secondary."

3. SAME—*when State's attorney is guilty of prejudicial misconduct in examining witnesses.* To show, for the purpose of dis-

crediting his testimony, that a witness has been convicted of an infamous crime the conviction must be proved by the record of the prosecution or an authenticated copy thereof, and the State's attorney, in asking a witness insinuative questions as to his previous conviction of such crime, is guilty of prejudicial misconduct sufficient to cause a reversal unless the evidence so clearly and conclusively shows the guilt of the defendants that their rights could not have been prejudiced by such misconduct.

4. SAME—*witness cannot be impeached by questions as to irrelevant matter.* A defendant or a witness cannot be impeached upon an immaterial statement or asked questions as to immaterial or irrelevant matters which necessarily tend to prejudice the defendant or witness before the jury.

WRIT OF ERROR to the Circuit Court of Cumberland county; the Hon. A. A. PARTLOW, Judge, presiding.

EMERY ANDREWS, and RAYMOND G. REAL, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, CHARLES M. CONNOR, Acting State's Attorney, and VIRGIL L. BLANDING, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiffs in error, Oscar Decker, Charlie Hall and Everett Croy, were convicted in the circuit court of Cumberland county of burglary and larceny, and the two first named were sentenced to indefinite terms in the penitentiary and the other defendant, Croy, was sentenced to serve an indefinite term in the State reformatory. They have prosecuted this writ of error to review the record.

The evidence for the People is, in substance, the following: Jane Mayberry, wife of Jesse Mayberry, on April 16, 1922, was the owner of about seventy-five or one hundred chickens, which at seven o'clock on that evening were in her chicken house, about thirty steps south of her residence, the door of which chicken house was closed but not locked. All of the chickens except twenty-one or twenty-two were missing on the following morning, having been stolen the

night of April 16, which was Sunday, after seven o'clock.
No commotion among the chickens or squawking by them
on that night was heard. There was no blood discovered in
the chicken house and no unusual amount of feathers was
found there, or other evidence that the chickens were killed
at or near the hen house. How the chickens were disposed
of does not definitely appear from the record. About ten
o'clock that night it began raining and rained heavily and
continuously during the remainder of the night, but it did
not rain any time on that day prior to said hour. In the
hen house on the morning of April 17 were found the tracks
of two men. The tracks of one of them were made by
small shoes and the others by large ones. In the south-
east corner of the hen house the water had leaked onto the
ground floor, and in this wet spot, where some ashes had
been thrown, were marks or prints apparently made by a
gunny sack, and there were two human tracks there, one on
each side of the print marks of the gunny sack. The rain
had been so heavy that all tracks on the outside of the hen
house had been obliterated. There were also some poles
thrown down on which the chickens roosted, and there were
some shoe-tracks under and near them. From the fore-
going circumstances, which are not disputed, it is inferable
that the chickens that were stolen were placed in the gunny
sack and carried away, and the burglary of the hen house
must have taken place after ten o'clock of the night of
the burglary and after it had rained considerably, and that
it continued to rain heavily after the burglary had been
committed.

The Mayberrys lived on the south side of a public road
that runs east and west, about fifty or sixty yards east of
the Mullen church, which is on the north side of the road.
They left their home on April 16 about seven o'clock and
attended services at the Mullen church, which closed near
nine o'clock, or perhaps a few minutes after that hour.
There at church Mrs. Mayberry saw the defendant Hall,

who she said was a familiar person as he was raised in that
neighborhood.   She stated that Hall a part of the time was
at the church door and part of the time at the window, and
was "just looking in like the rest of the boys who were out
there," and that she also saw him with two other parties
whom she did not recognize, sitting in a "shambly Ford
car."   She did not claim to see either of the other two de-
fendants at church.   Jesse Mayberry in the first part of his
testimony stated that he did not see any of the defendants
at church.   Later he testified that about dusk he saw some-
one that resembled the defendant Decker pass his house in
an old, "bum-looking car," about fifty yards from him.   He
further testified that between sundown and dark that even-
ing he saw some parties down at the church that resembled
the three defendants, but that he would not say positively
that they were the parties he saw.   Three of the People's
witnesses who knew the defendants testified that they saw
Hall at the church that Sunday night but did not see Decker
and Croy there.   One of these witnesses testified positively
that Decker and Croy were not there.   Two of these wit-
nesses testified that Hall left the church alone in his Ford
car, going east, and that after he had driven his car east
about 150 or 200 yards the car apparently "died on him"
and its lights went out, and that he stopped just about one
minute, or long enough to crank it again, and that then its
lights brightened up again and he drove east to the turn,
about one-half mile east of the church, and then drove south.
According to all the witnesses it was near nine o'clock when
Hall left the church, going east.

    All of the defendants testified in their own behalf and
positively denied having stolen the chickens or of having
been upon the premises of the Mayberrys.   The evidence
on their behalf showed that they left Effingham together in
Hall's Ford car in the afternoon of the day in question, at
which city Decker and Hall lived and Croy was at work
there.   They drove to the home of Mrs. George Miller, sis-

ter of Decker and half-sister of Hall, living in Montrose, and arrived there about 6:30 P. M. Hall then left Decker and Croy at Mrs. Miller's and drove to the Mullen church, which appears to be northeast of Montrose and not very far away, although the distance is not given. Hall's statement was that he drove east of Montrose on the hard road, then north and then west to the church, and that when he left the church he drove east, then south to the hard road, and thence to Mrs. Miller's, where Decker and Croy got into the automobile with him and they immediately started on their return to Effingham. Just after they had passed the westerly limits of Montrose on their way to Effingham they had a violent collision with another automobile, which tore a wheel off of each car and threw the defendants and their car off the road and into a ditch. Hall claims to have left the church at Montrose about twenty minutes to nine o'clock and while the people were standing, singing. The church closed about nine o'clock, and this collision occurred about nine o'clock according to the testimony of all the witnesses who viewed the scene of the wrecks. There were two men in the other automobile, and both of these men and the defendants agree that just after the collision their cars were about fifty yards apart, and that the occupants of each car immediately started for the other car to ascertain if anyone was hurt. The two men in the other car, Gilbert Gaddy and John McCann, witnesses for the People, testified that just before the collision the lights of the defendants' car went out and then the collision occurred; that they did not see any chickens there or in the automobile of the defendants and heard no noise made by chickens on the road there or in the automobile. One of them did testify that he heard a chicken squawk as he came back from Woody's garage, in Montrose, when he was about opposite a house near the road. He did not locate the chicken except to say that it was about as close to his own car as to the other car and that he did not pay any attention to it at

the time. A great number of people gathered at the scene of the collision just after it happened, and four of them testified for the People and four for the defendants. All of these witnesses united in testifying that they did not see any chickens or hear any chickens at the scene of the collision or at or near the car of the defendants. One of these witnesses, a farmer who lived on the road near there and who had a lantern, testified, in addition to the foregoing, that he sat in the automobile of the defendants while the garage men were repairing the car of the other men, and that he did not see any chickens or sign of chickens about the automobile or any sack. The garage men hauled the car of the defendants into Montrose after the other car was repaired, and their testimony is that there were no chickens or sign of chickens in or about this automobile. The defendants left their car at the garage in Montrose and went to Effingham in an old Ford automobile of the garage man, and they started to Effingham about midnight.

The garage man, Guy Woody, and his mechanic, gave the only testimony that could possibly tend to cast any suspicion on any of the defendants as to their being connected with the crime charged. This testimony was, in substance, that the defendants remained at the scene of the collision until the other car was repaired and then went with the garage man and his mechanic in their car to the garage. While there one Deeker, of Effingham, drove by in a Chevrolet roadster, and Woody suggested that the defendants could ride to Effingham with Deeker, who was a large man, weighing over two hundred pounds. The defendants and Deeker suggested that there was not room enough for all of them in Deeker's car. Woody testified that when he made this suggestion the defendant Decker said to him that "they had some chickens out there that they had gotten at Hall's mother's" that they wanted to take with them, and used that "as an excuse" for inducing him to let them have his automobile in which to drive home. His mechanic's tes-

timony was that he heard the defendant Decker say "they would be pretty crowded, and that they had some chickens out there that they would have to crowd in," but that he did not hear anyone say that they had gotten the chickens at Hall's mother's. Decker testified that what he said to Woody was that "we had a couple of chickens we had to take to Effingham and we had to have a car to go in." Decker explained that he intended to make it appear to Woody that they had a couple of women with them whom they had to take to Effingham, and told him that in order to get a car to go home in because they had to work next day, and that there was nothing said in that conversation with reference to taking some chickens that they had gotten out at Hall's mother's, and that Hall's mother was not mentioned in the conversation. Hall and Croy corroborated Decker in this testimony. Neither Hall nor Croy said anything about chickens or took any part in the foregoing conversation at the garage.

Mrs. Miller, sister of Decker and half-sister of Hall, testified that the defendants came to her house about 6:30 P. M. on the day of the alleged burglary; that Hall did not stop but went on to the Mullen church, or said he was going there; that the other two defendants stayed at her house from the time of their arrival until about nine o'clock, when Hall returned and they all left for Effingham, except that during the time Decker and Croy were stopping at her house they went to town and brought her children some candy. Mrs. Genevieve Emerick corroborated Mrs. Miller by testifying that Decker and Croy came to her store between seven and eight o'clock that evening; that Croy bought a package of cigarettes and Decker bought two cigars and fifteen cents' worth of gumdrops; that she recalled distinctly what these men bought, because Decker asked her to select the candy for the kids and that she did select it. She was not related to any of the defendants. Both Croy and Decker corroborated the testimony of Mrs. Miller and Mrs. Em-

erick, and positively stated that they were not at the Mullen church or on the premises of the Mayberrys during that evening and night, and Hall also corroborated them.

As already stated, the inference from the foregoing evidence is that the chickens in question were stolen after ten o'clock of the night in question and after a heavy rain had been falling, and that the thieves left the chicken house before it quit raining. The inference from the evidence is just as strong, or even stronger, that no one of the defendants was on the premises of the Mayberrys at any time that night before midnight, because both the People's and the defendants' witnesses account for Hall's presence at the church from seven o'clock P. M. until near nine o'clock, and the testimony shows without doubt that he must have been on the road in his automobile from the time he left the church until the collision, and the testimony of a great number of witnesses shows conclusively that he was at the scene of the collision and at the garage from the time of the collision until midnight, and that at midnight, or near that time, he left the garage with the other two defendants for Effingham. The only evidence in the record concerning their movements from the garage to Effingham was given by themselves, and it is entirely inconsistent with the supposition that they may have committed the crime after midnight and before going home. There is not even a suggestion by the People that this crime may have been committed after the defendants left the garage for Effingham. The testimony of the Mayberrys is positive that the chickens were in the chicken house at seven o'clock,—about the time Hall passed there,—and Mayberry states positively that he saw the chickens in the hen house at that time and closed the door. Therefore the unfortunate remark of Decker to the garage man about the chickens, whatever the remark may have been, has no significance whatever in view of all the other evidence in the case, because it is morally certain that defendants did not have any stolen chickens at that

310—16

time,—at least no chickens stolen from the Mayberrys. The claim of the defendants' counsel that the evidence in the record does not establish the guilt of any of the defendants beyond a reasonable doubt appears to us to be sustained by this record.

The defendants' claim that misleading and erroneous instructions were given by the court and that the State's attorney in his examination of witnesses was guilty of misconduct prejudicial to them is sustained. People's instruction No. 13 reads as follows:

"The court instructs the jury that under the law, in order to warrant a conviction in this case, you are only required to believe from the evidence, beyond a reasonable doubt, that the defendants, or any one or more of them, committed the crime as charged in the indictment."

This instruction is very misleading. The jury were likely to understand it to mean that in order to convict all of the defendants, or any particular one of the defendants, it was only necessary to believe from the evidence, beyond a reasonable doubt, that the defendants, or any one or more of them, committed the crime.

Instruction No. 8 for the People informed the jury that it is sufficient that the guilt of the defendants be proved by secondary or circumstantial evidence, either in whole or in part, if the entire evidence introduced is of such a character that it dispels all reasonable doubt as to the guilt of the accused. The objection, of course, is to the use of the word "secondary."

In instruction No. 9 for the People the jury were told that the defendants had put in evidence their general reputation for peaceableness, and it directed the jury that notwithstanding such proof they might still find the defendants guilty if the facts warranted it. There was no such proof introduced, and the instruction, therefore, had no proper place in the record.

The State's attorney was guilty of such misconduct in examining witnesses as would necessarily cause a reversal of any judgment of conviction unless the evidence so clearly and conclusively showed the defendants to be guilty that the court could say that such misconduct did not substantially prejudice the rights of the defendants. The rule of law in this State is, that if a defendant, or a witness who has testified, has been convicted of an infamous crime in a court of record, as defined by section 7 of division 2 of our Criminal Code, such conviction may be proved for the purpose of discrediting him. Only the conviction of such a crime can be proven for the purpose of discrediting the defendant or a witness when he testifies, and it is not sufficient that he may have been charged with such a crime or indicted for such a crime. The proof must also be made by the record of the conviction or an authenticated copy thereof, as was held in the case of *Bartholomew* v. *People*, 104 Ill. 601, and it must also appear that the conviction was had before a competent tribunal having jurisdiction to act and decide. Notwithstanding the foregoing long established rule, the State's attorney in this case, on his cross-examination of the defendant Hall, asked him the following questions: "You have been in trouble of this kind before, haven't you?" and "You have had criminal charges preferred against you before?" Objections were sustained to both of these questions without any comment thereon by the court. There is no question more damaging to a defendant with a jury than one that suggests or intimates that he is a criminal or has been charged with criminal offenses.

The defendant Croy was cross-examined extensively by the State's attorney as to sales of chickens he had made to various parties. Croy answered that he had sold chickens to Connor & Smith, in Toledo, and that they were chickens that he had gotten from home. The State's attorney then suddenly asked this question: "You tell me you did not drive to Connor & Smith's one morning before sun up, with

the horse lathering, and sell him some chickens?" Upon objection being made to this question the court said, "It wouldn't be competent at all if you hadn't opened up the gate." The cross-examination continued quite extensively as to various sales of chickens Croy had made, all of which was improper, and the only statement he had made previous to this examination that the court could have referred to was his statement that he had never been convicted of a crime and had never been accused of a crime. This gave the State's attorney no right to ask this insinuating and impudent question, which did not even tend to rebut anything the defendant had testified to. Besides, it is a well established rule of law that a defendant or a witness cannot be impeached upon an immaterial statement or asked questions as to immaterial or irrelevant matters of the character aforesaid, which necessarily tend to prejudice the defendant or witness before the jury.

For the foregoing reasons the judgment of the circuit court is reversed and the cause is remanded.

*Reversed and remanded.*