98 P.3d 250

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Jason McELROY, Defendant–Appellant.**

No. 25190.

Intermediate Court of Appeals of Hawai'i.

June 29, 2004.

Certiorari Granted Aug. 2, 2004.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

Edward K. Harada, Deputy Public Defender, on the briefs, for Defendant–Appellant.

BURNS, C.J., and WATANABE, J.; and NAKAMURA, J., dissenting.

Opinion of the Court by BURNS, C.J.

Jason McElroy (McElroy or Defendant) appeals from the June 7, 2002 Judgment of the First Circuit Court[1] convicting him of Sexual Assault in the Third Degree, Hawaii

---

1. The Honorable Richard K. Perkins presiding.

Revised Statutes (HRS) § 707–732(1)(a) (1993) [2], and sentencing him to probation for five years, subject to special terms and conditions. We vacate the June 7, 2002 Judgment and remand the case to the circuit court for a new trial.

## BACKGROUND

A University of Hawaiʻi (UH) dormitory apartment (the apartment) was occupied by the following four females: C.E., S.W., E.M., and J.F. The apartment had two bedrooms, a kitchen, and a living room. One of the bedrooms was occupied by C.E. and S.W., and the other was occupied by E.M. and J.F.

On the evening of October 31, 2001, C.E., S.W., and E.M., along with approximately ten other friends from the UH and elsewhere, met at the apartment. Three members of the group included the following three members of the United States Navy: Corey Blackwell (Blackwell), Lucas Tetrault (Tetrault), and McElroy. This was the first time C.E. had ever met McElroy. The group left the apartment and headed into Wai-kīkī. Although C.E. admits to having "[t]hree or so" beers before leaving the apartment, she denies drinking alcohol in Wai-kīkī.

C.E. testified that she, her boyfriend (Boyfriend), and S.W. headed back to the apartment around 1:00 a.m. C.E. recalled that she was tired and dehydrated upon arrival, so she and Boyfriend went to sleep. She remembers falling asleep in her bed with Boyfriend between 1:00 a.m. and 2:00 a.m. C.E. testified that she went to bed wearing only a bra and her underwear. Boyfriend testified that after C.E. and S.W. fell asleep, he went home.

E.M. testified that she, Blackwell, Tetrault, and McElroy arrived back at the apartment between 2:00 a.m. and 3:00 a.m. Once in the apartment, McElroy went into C.E. and S.W.'s bedroom and asked S.W. if he could share one of the bedroom's two beds with her. S.W. agreed and McElroy "squeez[ed]" into her bed. According to S.W., "at our

apartment ... people stay over and we always share a bed together, like friends and stuff, and nothing ever happens."

S.W. testified that soon after McElroy got into the bed he told her "I'm not going to let you sleep, and then ... he touched me by my waist on the right side ... and then he grabbed my, uh, breast." S.W. testified that she did not at any time give McElroy permission to touch her. S.W. immediately responded by grabbing her pillow and blanket, moving to the couch in the living room, and going to sleep there.

C.E. testified that after she fell asleep in her bed, she "was kind of waking up, kind of half dreaming, half asleep to someone touching me around my vagina. And I thought that it was [Boyfriend], so I didn't open my eyes because he had been there. He was the last person who had been in my bed." She then testified that "this person was licking around my vagina and stuck his fingers in my vagina and then licked—started to lick around my anus and then stuck his fingers in my anus. And that's when I opened my eyes to see who it was." C.E. testified that she thought it would be Boyfriend when she opened her eyes, but when she saw that it was McElroy, "I was appalled. I was shocked. I was disgusted. I was angry. I was—I couldn't believe it. It was the last thing I would have ever expected." She remembered that she "asked him who the fuck he was, and I then I [sic] told him to get the fuck out of my room." C.E. testified that she did not give McElroy permission to touch her in any way, and the entire contact could have gone on for ten (10) or fifteen (15) minutes. After being told by C.E. to get out of her room, McElroy left. McElroy did not attempt to restrain C.E. in the room, and he did not have to be forced out of her room.

S.W. testified that she called campus security and at approximately 3:26 a.m., the police arrived.

McElroy testified that the police took him to the police station, handcuffed him, and placed plastic bags over his hands to pre-

---

**2.** Hawaii Revised Statutes (HRS) § 707–732(1)(a) (1993) states:

(1) A person commits the offense of sexual assault in the third degree if:

(a) The person recklessly subjects another person to an act of sexual penetration by compulsion[.]

serve any evidence. After sitting in a holding area for several hours, the following occurred:

Q The detective asked if you wanted to make a statement?

A Yes.

Q And you made a statement?

A Yes.

Q You didn't ask to talk to a lawyer first?

A No.

Q You didn't just keep your mouth shut?

A No.

Q Did you want to tell them what had happened?

A Yes.

Q After making your statement to the police, to ... Detective Kellett, what happened?

A After that they sent me to a cell. They just basically sent me back to my cell. 'Cause they made me sleep it off. I had to sleep it off first because I was still drunk when I went there. Then after I talked to him, they sent me to a cell.

On November 6, 2001, a grand jury indicted McElroy on five separate counts of sexual assault. Count I charged McElroy with knowingly subjecting C.E. "to an act of sexual penetration by compulsion, by placing his mouth on her vagina, thereby committing the offense of Sexual Assault in the Second Degree."

Count II charged McElroy with knowingly subjecting C.E. "to an act of sexual penetration by compulsion, by inserting his finger into her vagina, thereby committing the offense of Sexual Assault in the Second Degree."

Count III charged McElroy with knowingly subjecting C.E. "to an act of sexual penetration by compulsion, by placing his mouth

on her anus, thereby committing the offense of Sexual Assault in the Second Degree."

Count IV charged McElroy with knowingly subjecting C.E. "to an act of sexual penetration by compulsion, by inserting his finger into her anus, thereby committing the offense of Sexual Assault in the Second Degree." Count V charged McElroy with knowingly subjecting S.W. "to sexual contact by compulsion, by placing his hand on her breast, thereby committing the offense of Sexual Assault in the Fourth Degree."

On November 2, 2001, the Office of the Prosecuting Attorney recommended bail for McElroy in the aggregate amount of $25,000.00. The Bail Form submitted to the court by Deputy Prosecuting Attorney Scott Bell (the Prosecutor) states, in relevant part, that

[C.E.] is a 20 year old college student at UH who was asleep in her dorm room when she was sexually assaulted by [McElroy], a sailor in the U.S. Navy. [C.E.] is from out of state. [C.E.] does not know [McElroy]. [McElroy] assaulted victim by placing his mouth on [C.E.'s] vagina and anus, and by inserting his finger into her vagina and anus. [McElroy] has a record in Illinois.

The Prosecutor did not identify the specifics of McElroy's "record in Illinois."

On November 26, 2001, McElroy filed a Motion for Supervised Release and/or Bail Reduction. On December 18, 2001, the response of the State of Hawai'i Department of Public Safety was filed. It revealed that, "[a]ccording to the National Crime Information Center, [McElroy] was arrested in Chicago, Illinois, on April 21, 1999, for Possession of Cannabis, and on December 14, 1998, for Possession of Controlled Substance. There was no conviction information reported." [3]

---

3. Query the relevance of the two previous arrests. HRS § 804-3 (1993) states, in relevant part, as follows:

 **Bailable offenses.** (a) For purposes of this section, "serious crime" means murder or attempted murder in the first degree, murder or attempted murder in the second degree, or a class A or B felony, except forgery in the first

degree and failing to render aid under section 291C–12, and "bail" includes release on one's own recognizance, supervised release, and conditional release.

 (b) Any person charged with a criminal offense shall be bailable by sufficient sureties; provided that bail may be denied where the charge is for a serious crime, and:

On March 8, 2002, McElroy filed Defendant's Motion in Limine # 1 asking for various orders including the following:

4. [McElroy] requests an Order excluding and precluding from use at trial the following evidence:

(a) Any testimonial or documentary evidence or reference by any State witness relating to any prior allegations of criminal acts by [McElroy]; and

(b) Testimonial or documentary evidence relating to any other "bad acts" involving [McElroy], or matters which should nevertheless be excluded as irrelevant under [Hawaii Rules of Evidence (HRE)] 402, or as unfairly prejudicial under HRE 403, including but not limited to:

i) A statement allegedly made by State's witness, Lucas Tetrault, to HPD Officer Dru Akagi, that "... he knows how "Mac" [sic] can be. He can be aggressive towards women."

On March 11, 2002, the day before the trial commenced, the State had no objection to requests 4(a) and (b), and the court granted those requests.[4]

(1) There is a serious risk that the person will flee;
(2) There is a serious risk that the person will obstruct or attempt to obstruct justice, or therefore, injure, or intimidate, or attempt to thereafter, injure, or intimidate, a prospective witness or juror;
(3) There is a serious risk that the person poses a danger to any person or the community; or
(4) There is a serious risk that the person will engage in illegal activity.
(c) Under subsection (b)(1) a rebuttable presumption arises that there is a serious risk that the person will flee or will not appear as directed by the court where the person is charged with a criminal offense punishable by imprisonment for life without possibility of parole. For purposes of subsection (b)(3) and (4) a rebuttable presumption arises that the person poses a serious danger to any person or community or will engage in illegal activity where the court determines that:
(1) The defendant has been previously convicted of a serious crime involving violence against a person within the ten-year period preceding the date of the charge against the defendant;

During his trial, on direct examination by his counsel, McElroy testified, in relevant part, as follows:

Q [McElroy], after you graduated from high school, what did you do?

A I joined the Navy.

Q Why did you join the Navy?

A Because to make my family proud. And I was doing bad and I wanted to change and stuff like that.

Q So after high school, you thought that it would be a positive thing for you to join the Navy?

A Yes.

Q And what did that give you a chance to do?

A Go to college and see the world and just learn something new.

Q Is that one of your goals, to eventually go to college?

A Yes.

Q And the Navy would be able to help you with that?

A Yes.

McElroy testified that when S.W. got up out of bed he also got up " '[c]ause when she opened the door and left out [sic], I smelled the food, and so then I got out right behind

(2) The defendant is already on bail on a felony charge involving violence against a person; or
(3) The defendant is on probation or parole for a serious crime involving violence to a person.
(d) If, after a hearing the court finds that no condition or combination of conditions will reasonably assure the appearance of the person when required or the safety of any other person or community, bail may be denied.

4. The suppression of "(b) i)" is sufficiently specific. The suppression of "(a)" should be more specific in identifying the "prior allegations of criminal acts by [McElroy]." The suppression of "(b)" lacks sufficient specificity. It suppresses "[t]estimonial or documentary evidence relating to any other 'bad acts' involving [McElroy], or matters which should nevertheless be excluded as irrelevant under [Hawaii Rules of Evidence (HRE)] 402, or as unfairly prejudicial under HRE 403[.]" We caution against the entry of unspecific suppression orders that do no more than require compliance with the HRE. Such suppression orders are unnecessary and redundant. Moreover, when allegedly violated, they cause confusion and more serious problems.

her and walked right out too. And then I went in the kitchen with Cor[e]y where he was cooking." After that he went back to S.W.'s bedroom and laid down on S.W.'s bed. McElroy testified that the following then occurred:

> And I was laying down and the alcohol was messing with my head because I had been up sitting down all day. And then when I finally lay still, the alcohol had my head spinning. So I was like twisting and turning in the bed. And then when I finally stopped, [C.E.] was like, "Hey, you, come over here. And then I told her who I was. And she was like, Hey, you, come over here. And then that's when I went over there."

McElroy then testified that he went over to C.E. and she hugged him and gave him a kiss on the cheeks and on the lips. McElroy then "pulled her panties like to her knees, and then she wiggled out of them." McElroy performed oral sex on her for about eight (8) to twelve (12) minutes. After having oral sex with C.E., McElroy went up to kiss her and "she kissed me again. This time it was like a longer kiss. And then after that, it was like hocus-pocus or whatever you want to call it. And she was just like, [g]et off me, you mother fucker, and stuff like that." McElroy said he "jumped back", walked out of the room, and told Tetrault what happened. McElroy went back in the room to apologize to C.E., but she again told him to get out. McElroy admitted that he did not ask C.E. for permission to have oral sex with her.

On cross-examination, the Prosecutor asked McElroy about his background:

Q You also told us that you joined the Navy to change; is that correct?

A Yes.

Q Change from what?

A Well, when I was back home, I was doing bad. Well, I was hanging with the wrong people—drugs and gang-banging and stuff like that. And I got tired of doing that[.]

Immediately, McElroy's defense counsel asked to approach the bench, where the following dialogue took place:

[DEFENSE COUNSEL]: Well, Judge, I have to move for a mistrial. I didn't anticipate that answer from [McElroy]. And I believe [the Prosecutor] violated the motion in limine regarding bad acts. It was in response to a question posed.

[PROSECUTOR]: Your Honor, I was completely unaware of anything. On direct, the defense asked, why did you join the Navy, and he said to change. So I simply just followed that up. I didn't know of any bad acts. I just followed it up with what [Defense Counsel] asked on direct. I was completely unaware of any bad acts. I don't have a rap for defendant. I don't know anything about him. But the defense during his opening questions to him asked him why he joined the Navy.

THE COURT: I'm going to instruct the jury to disregard it. I'm going to take the motion for mistrial under advisement.[5]

[PROSECUTOR]: And I'll move along.

THE COURT: You better.

(Footnote added.)

The bench conference concluded and the court instructed the jury as follows: "[T]he Court is going to strike the defendant's last answer. Whatever the defendant did prior to his joining the Navy is not relevant to any issue before this jury. So you will disregard that. It shouldn't have been before you at all."

McElroy continued to testify, stating that he did not know C.E. and Boyfriend were girlfriend and boyfriend. McElroy also said that, until S.W. told him, he was unaware that C.E. thought he was Boyfriend.

After the completion of McElroy's testimony, the case was sent to the jury. During its deliberations, the jury sent three communications to the court. The first communication was received on Friday, March 15, 2002 at 1:54 p.m. and said, "We cannot agree. Where do we go from here? Re: Element Number Two." The court's response was, "Please continue your deliberations."

The second communication from the jury asked:

---

5. After initially taking it under advisement, the court later denied McElroy's motion for mistrial.

Please clarify: Does the legal definition of "compulsion" mean the same in offense [sic] of Sexual Assault in the Second degree as well as Sexual assault in the Third degree? Also, does consent have to be given before physical contact. We'd appreciate some direction on these points so we can arrive at a just decision in a timely manner.

The court answered:

As to your first question, the definition of "compulsion" on page 21 of the jury instructions [6] applies to both Sexual Assault in the Second Degree and Sexual Assault in the Third Degree.

As to your second question, this is something you must determine based upon the jury instructions you already have.

The third communication from the jury stated, "We have reached a unanimous decision on Counts I in the Third Degree and Count V." The court replied by asking, "Have you reached a unanimous verdict as to each of the five counts?" The jury answered, "No." The court then asked, "Would further deliberation of any length be reasonably likely to result in a unanimous verdict as to any of Counts II, III, or IV?" The jury again answered, "No."

The jury was called in to read its verdicts on Counts I and V. Before the verdicts were read, the court declared a mistrial on Counts II, III, and IV because the jury was unable to reach a unanimous verdict in those matters. As to Count I, the jury found McElroy guilty "of the included offense of Sexual Assault in the Third Degree." As to Count V, the jury found McElroy not guilty.

McElroy filed a notice of appeal on July 1, 2002. The appeal was assigned to this court on August 6, 2003.

## POINT OF ERROR

McElroy's sole point of error on appeal is that the court reversibly erred when it denied his motion for mistrial after the prosecution "engaged in misconduct when it elicited 'prior bad acts' of [McElroy]".

**6.** The jury instructions defined compulsion as

## STANDARD OF REVIEW

### A. The Difference Between a Prosecutorial Mistake/Error and Prosecutorial Misconduct

■ The California Court of Appeals for the 5th District has stated that:

It is settled that a mere mistake relative to the admissibility of proferred evidence is not misconduct in the absence of a showing that the prosecutor was not acting in good faith. The term "misconduct," when applied to an act of an attorney, implies a dishonest act or an attempt to persuade the court or jury by use of deceptive or reprehensible methods.

Similarly, the Pennsylvania Supreme Court has held that no basis exists for the claim of prosecutorial misconduct where the improper questioning was not intended to inflame the passions and prejudices of the jury to the extent that the defendant was deprived of a fair trial.

*State v. Palabay,* 9 Haw.App. 414, 429–30, 844 P.2d 1, 9 (App.1992) (citations omitted).

The primary reason a distinction must be made between a prosecutorial mistake/error and prosecutorial misconduct is Rule 8.4 of the Hawai'i Rules of Professional Conduct (2004). It states as follows:

**Misconduct.**

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(d) fail to cooperate during the course of an ethics investigation or disciplinary proceedings;

"absence of consent."

(e) state or imply an ability to influence improperly a government agency or official; or

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

Prosecutorial misconduct is a violation of Rule 8.4 of the Hawai'i Rules of Professional Conduct (2004). Prosecutorial mistake/error is not a violation of that rule.[7]

### B. The Standard of Review Applicable to a Prosecutorial Mistake/Error and Prosecutorial Misconduct

Although the following precedents speak only of "prosecutorial misconduct", they apply to both prosecutorial misconduct and a prosecutorial mistake/error.

■ "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. Mara*, 98 Hawai'i 1, 16, 41 P.3d 157, 172 (2002) (quoting *State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996)). Prosecutorial misconduct is "reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. St. Clair*, 101 Hawai'i 280, 286, 67 P.3d 779, 785 (2003) (citations and internal quotation marks omitted). The prosecution bears the burden of showing that the misconduct was harmless beyond a reasonable doubt. *State v. Smith*, 91 Hawai'i 450, 461, 984 P.2d 1276, 1287 (App.1999). Factors to consider are: (1) the nature of the prosecutorial misconduct; (2) the promptness or lack of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. *State v. Wakisaka*, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003) (citation omitted). Under the Hawai'i Constitution, "reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond

a reasonable doubt that the defendant received a fair trial." *St. Clair*, 101 Hawai'i at 287, 67 P.3d at 785 (citation omitted).

### C. The Standard of Review Applicable to the Erroneous Admission of Evidence of Prior Crimes

■ "The standard of review applied to the erroneous admission of evidence of prior crimes is whether 'the error was harmless beyond a reasonable doubt.'" *State v. Kutzen*, 1 Haw.App. 406, 414, 620 P.2d 258, 263 (1980) (quoting *State v. Pulawa*, 62 Haw. 209, 220, 614 P.2d 373, 379 (1980)).

### D. Denial of a Motion for Mistrial

■ "The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion." *State v. Rogan*, 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999) (citations omitted). An abuse of discretion occurs when the trial court "clearly exceeds the bounds of reason and disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (citations omitted).

## DISCUSSION

### A. The Relevant Prohibitions

The relevant suppression order prohibited "[t]estimonial or documentary evidence relating to any other 'bad acts' involving [McElroy], or matters which should nevertheless be excluded as irrelevant under HRE 402, or as unfairly prejudicial under HRE 403[.]"

■ Even in the absence of a relevant suppression order, a prosecutor errs when he or she presents evidence of the defendant's prior criminal activity, *Pulawa*, 62 Haw. at 220, 614 P.2d at 379, except in situations where evidence of the defendant's prior criminal activity is admissible pursuant to HRE Rules 403 and 404.

---

7. In our view, there is a difference between advocacy involving a prosecutorial mistake/error and advocacy involving prosecutorial misconduct.

### B. Defendant Did Not Violate Either of the Relevant Prohibitions

The following question and answer did not violate the relevant prohibitions:

Q Why did you join the Navy?

A Because to make my family proud. And I was doing bad and I wanted to change and stuff like that.

### C. The Prosecutor Violated Both Relevant Prohibitions

 The prosecutor violated both relevant prohibitions when he introduced the following evidence:

Q You also told us that you joined the Navy to change; is that correct?

A Yes.

Q Change from what?

A Well, when I was back home, I was doing bad. Well, I was hanging with the wrong people—drugs and gang-banging and stuff like that. And I got tired of doing that[.]

### D. Defendant's Answer Was Not a Damaging Statement Volunteered by the Defendant

 Damaging statements volunteered by the defendant generally are not grounds for declaring a mistrial. *See People v. Barker*, 161 Mich.App. 296, 305–306, 409 N.W.2d 813, 817 (1987); *cf. People v. Kirkwood*, 17 Ill.2d 23, 31, 160 N.E.2d 766, 771 (1959) (defendant in no position to complain about volunteered statement because there was nothing in the record to show the prosecutor was attempting to introduce prejudicial evidence).

The State contends that McElroy's "response was *volunteered* [so] the State should not be held responsible for it." We conclude that McElroy's answer was not a "volunteered statement" because a defendant's relevant answer in reasonable response to a question is not a "volunteered statement[.]" In this case, McElroy's answer was a relevant answer in reasonable response to the Prosecutor's question. The difference between a relevant answer in reasonable response to a question and a volunteered state-ment is emphasized in *State v. Corella*, which states:

Lastly, Defendant claims that two responses by Complainant in cross-examination were non-responsive and, in the aggregate, prejudicial. In the first response, Complainant stated she knew that Defendant had been violent in the past. The judge struck this remark from the record. Soon after the first response, Complainant stated that Defendant had "fondled" other women in public. The judge refused to strike this comment.

. . . .

The first response was made in the following context:

Q. [(Defense attorney)] [Defendant] did not strike you in any way; is that a fair statement?

A. [(Complainant)] That is a fair statement. [Defendant]—

Q. Just [sic] asked you if he had stricken you, if he had attempted or actually hit you in any way up to this point?

A. No.

Q. Okay.

A. I am aware of his violence in the past.

[Defense attorney]: I move that that be stricken from the record and the jury be instructed to disregard that comment.

THE COURT: So ordered. The jury will disregard the last remark.

Defendant submits that the unfair prejudice resulting from Complainant's unsolicited reference to Defendant's alleged prior bad acts was not cured by the trial court's prompt instruction. The Supreme Court of Hawai'i has held that "any harm or prejudice resulting to the defendant [from a remark by a witness for the prosecution] can be cured by the court's instructions to the jury. In such cases it will be presumed that the jury adhered to the court's instructions." Even so, there are instances where a "deliberate and unresponsive injection by [a] prosecution [witness] of irrelevant references to prior ... [bad acts] may generate insurmountable prejudice to the cause of an accused."

. . . .

388

The colloquy that gave rise to the second response was as follows:

Q. [Complainant], didn't, you know— let's be honest with—honest with each other. After everything you have testified that happened, your response is—you recall the dialogue with [Defendant], he turned past your place, he goes down few [sic] miles, he goes up the dirt road, he shuts the ignition, you know, shuts the lights off, he slips across the bench seat, tries to kiss you, and you don't know what—what's about to happen or what he wants?

A. I couldn't believe that [Fiancé's] best friend and somebody that I had been acquainted with would do anything to me that [Defendant] had done.

Q. Well, you did not believe that may be [sic] he might try to have sex with you after he kept putting his hands on your leg, you told us, repeatedly between Keaau [Kea'au] and Pahoa? You kept saying he kept repeatedly putting his hands on—on your thigh, didn't he?

A. Sir—

Q. What does that tell you, [Complainant]? He repeatedly puts his hand on thigh—on your thigh, you're repeatedly pushing his hand away, and he's repeatedly putting his hands back on your thigh. [Complainant], what do you think it is he wants to do there?

A. Sir, [Defendant] has fondled several women—

[DEFENSE ATTORNEY]: I object.

A. —in public.

[DEFENSE ATTORNEY]: I object, and move that that be stricken from the evidence. I asked what she thought was happening. That's a gratuitous comment of the—

[DEPUTY PROSECUTING ATTORNEY]: I also—Your Honor, counsel opened this. He—

THE COURT: I think she [sic] answering you as best way [sic] she can. Overruled.

A trial court's admission of testimony is reviewed for abuse of discretion. The proper remedy for a non-responsive or im-

proper answer to a proper question is to have the answer stricken. As with the prior considered remark, Complainant's answer here was not specifically responsive to defense counsel's question.

79 Hawai'i 255, 264–65, 900 P.2d 1322, 1331–32 (App.1995) (brackets in original); *see also* *State v. Kuba*, 68 Haw. 184, 189, 706 P.2d 1305, 1309 (1985) ("Officer Main . . . asked if she had been drinking, which she readily admitted. She told him she had a drink earlier that night and then volunteered she had been cited for three traffic violations a few minutes earlier."); *In Re Doe*, 76 Hawai'i 85, 90 n. 7, 869 P.2d 1304, 1309 n. 7 (1994) ("No questions were posed of any witness soliciting any characterization of the Minor's 'tone,' and no testimony was volunteered in this regard.")

E. Prosecutorial Mistake/Error, Not Prosecutorial Misconduct

We conclude that a prosecutorial error/mistake, not prosecutorial misconduct, occurred when the Prosecutor, during his cross-examination of McElroy, asked, "[c]hange from what?"

In support of its argument that the Prosecutor's question was not prosecutorial misconduct or prosecutorial error/mistake, the State repeats what the Prosecutor told the trial court:

Your Honor, I was completely unaware of anything. On direct, the defense asked, why did you join the Navy, and he said to change. So I simply just followed that up. I didn't know of any bad acts. I just followed it up with what [Defense Counsel] asked on direct. I was completely unaware of any bad acts. I don't have a rap for defendant. I don't know anything about him. . . .

The Prosecutor's during-trial statements to the court that he "was completely unaware of any bad acts" and did not "have a rap for defendant" are contradicted by the fact that the Prosecutor, in his pre-trial comments to the court regarding the issue of bail for McElroy, told the court that "[McElroy] has a record in Illinois." However, the Prosecutor made these during-trial statements to the

court after the jury heard McElroy's prejudicial testimony.

The State also asserts that "[t]here was nothing improper or suggestive about [the Prosecutor's] question, it did not naturally call for such a response nor did it infer such a response." We disagree. McElroy had already testified that "I was doing bad and I wanted to change[.]" This testimony did not violate either of the two relevant prohibitions. Evidence of "doing bad" is not "[t]estimonial or documentary evidence relating to any other 'bad acts' involving [McElroy], or matters which should nevertheless be excluded as irrelevant under HRE 402, or as unfairly prejudicial under HRE 403," nor is it "evidence of the defendant's prior criminal activity[.]"

In light of McElroy's testimony that he joined the Navy to change from "doing bad", the following questions asked by the prosecutor and the evidence introduced in response to them violated both of the relevant prohibitions.

> Q You also told us that you joined the Navy to change; is that correct?
>
> A Yes.
>
> Q Change from what?
>
> A Well, when I was back home, I was doing bad. Well, I was hanging with the wrong people—drugs and gang-banging and stuff like that. And I got tired of doing that—

This conclusion is based on the facts that this examination asked McElroy to state the specifics of his "doing bad" and those specifics included McElroy's prior criminal activity and thereby created the strong likelihood of introducing evidence in violation of the suppression order. This questioning had no more than the following two purposes: (a) repeating McElroy's "doing bad" testimony; and/or (b) disclosing evidence that would violate the suppression order. If the purpose was (a), the questioning was irrelevant, duplicative, and superfluous. If the purpose was (b), it violated the suppression order and the rule of evidence stated in *State v. Pulawa, supra.*

In *People v. Harges,* the Appellate Court of Illinois stated, in relevant part:

We are in accord with the defendant's contention that he was deprived of a fair trial by prejudicial tactics of the prosecutor during the course of the trial. The prosecutor asked the defendant, on cross-examination, about the events that occurred subsequent to his arrest, and in particular about what transpired in the Fillmore Police Station:

> Q. What did you observe at the Fillmore Police Station, did you see anything on the wall?
>
> A. Some signs in regard to the law, and it said something about your rights to legal counsel.
>
> Q. Have you ever seen Fillmore Station before?
>
> A. I have, do you mean before I was arrested?
>
> Q. At any other time?
>
> Mr. Bronstein: Objection to counsel's speech.
>
> The Court: Sustained.
>
> Mr. Davidson (prosecutor): What is he objecting to?
>
> The Court: He is objecting to him asking has he seen Fillmore Police Station before.
>
> Mr. Davidson: So you sustained the objection.
>
> The Court: That is correct.

The State, in its brief, insists that the question asked of the defendant—"Have you ever seen Fillmore Station before?"—, when it stands alone, is totally vague and ambiguous; the defendant's claim that this question suggested to the jury defendant's prior arrest record is pure conjecture; and moreover, that the Court sustained counsel's objection to this question, and therefore no error was committed. The evidence in this case was of such a character that the prosecutor's question relating to a prior arrest of the defendant was clearly improper; this question represented an obvious attempt by the prosecution to bring to the attention of the jury the fact that the defendant had been to the Fillmore Station on a prior arrest. We can see no other purpose for this inquiry. It had

no bearing on the question of guilt. It was otherwise irrelevant to and unconnected with any of the testimony previously given by the defendant on direct examination. Conduct such as that exhibited by the prosecutor in the instant case has been condemned on many occasions. The error is not cured by the court sustaining an objection. *People v. Black*, 317 Ill. 603, 614, 148 N.E. 281. As the Supreme Court stated in *People v. Decker*, 310 Ill. 234, 141 N.E. 710, "There is no question more damaging to a defendant with a jury than one that suggests or intimates that he is a criminal [sic] or has been charged with criminal offenses." (P. 243, 141 N.E. p. 714.) Such conduct is clearly reversible error.

87 Ill.App.2d 376, 379–81, 231 N.E.2d 650, 652–53 (1st Dist.1967).

Viewed in context, however, the cross-examination that led to the violation of the court's suppression order was the Prosecutor's mistake/error, not "a dishonest act or an attempt to persuade the court or jury by use of deceptive or reprehensible methods." *Palabay*, 9 Haw.App. at 429, 844 P.2d at 9.

### F. The Erroneously Admitted Evidence Was Not Harmless Beyond a Reasonable Doubt

█ As noted above, a prosecutorial mistake/error in the presentation of evidence is "reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *St. Clair*, 101 Hawai'i at 286, 67 P.3d at 785 (citations and internal quotation marks omitted). Factors to consider are: (1) the nature of the prosecutorial mistake/error; (2) the promptness or lack of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. *Wakisaka*, 102 Hawai'i at 513, 78 P.3d at 326.

### 1. Nature of the Prosecutorial Mistake/Error

█ It is commonly recognized across the nation that evidence that the defendant participated in "gang-banging"[8] is often unfairly prejudicial, since juries frequently associate gangs with criminal activity and improperly convict based on inferences to the defendant's character. *See* 39 A.L.R.4th 775 (1985); *see also State v. Kauhi*, 86 Hawai'i 195, 206, 948 P.2d 1036, 1047 (1997). Evidence of defendant's participation in "gang-banging" will therefore only be admissible when its probative value outweighs the risk of unfair prejudice. *See* HRE 403. Considering that the present case is about a single incident of alleged sexual assault, the mention of McElroy's involvement in "drugs and gang-banging and stuff like that" was irrelevant, and more unfairly prejudicial than it was probative. HRE 403.

### 2. The Promptness of a Curative Instruction

Ordinarily it may be presumed that a jury will abide by the court's instruction to disregard anything that has been improperly placed before it. The error is generally considered cured by the instruction. But an instruction not to consider incompetent testimony does not always cure the error. When the testimony is prejudicial

---

8. "Gangbang" is defined as either (1) "Sexual intercourse, often rape, involving one person or victim and several others who have relations with that person in rapid succession" or (2) "Sexual intercourse involving several people who select and change partners in an indiscriminate manner." *THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE* (4th ed.2000) *available at http://dictionary.reference.com/search?q=gangbang*. Although it was not defined to the jury, we understand the term "gang-banging" as slang to describe "illegal street gang activity such as drug trafficking and the accompanying violence." *State v. Brumfield*, 136 Idaho 913, 915 n. 1, 42 P.3d 706, 708 n. 1 (App.2002). However, it is very possible that one or more of the jurors understood the term to mean being a member of a group of males who take turns having sexual intercourse (vaginally and/or anally) with one person—either male or female. *See DeLuca v. Lord*, 858 F.Supp. 1330, 1336 (S.D.N.Y.1994); *People v. Colin*, 344 Ill. App.3d 119, 123, 278 Ill.Dec. 733, 738, 799 N.E.2d 451, 456 (2003). While both definitions are highly prejudicial, the definition that describes engaging in sexual intercourse, in the

to the opposing party's cause, the presumption prevails only if there is a reasonable certainty that the impression upon the jury could be or was dispelled by the court's admonition. The error is not cured when it is likely that the adverse effect of the improper testimony might not be eradicated by the instruction.

*Young v. Price,* 48 Haw. 22, 27, 395 P.2d 365, 368 (1964) (citations omitted). This rule applies with equal force when the testimony is prejudicial to the testifying party's cause.

In the case at hand, the trial judge instructed the jury immediately after McElroy's counsel moved for a mistrial. The court stated: "[T]he Court is going to strike the defendant's last answer. Whatever the defendant did prior to his joining the Navy is not relevant to any issue before this jury. So you will disregard that. It shouldn't have been before you at all." This instruction weighs in favor of the State. It was prompt, and it addressed the lack of relevance McElroy's statement had to the case before the jury. Nevertheless, we are not reasonably certain that the negative impact McElroy's testimony of his prior involvement in "drugs and gang-banging and stuff like that" was erased by the court's admonition. It is very possible that the court's instruction did not eradicate the adverse effect of McElroy's testimony.

### 3. The Strength or Weakness of the Evidence

Since the principal issue at McElroy's trial was whether C.E. consented to having sex with him, this case is similar to the facts in *Rogan,* 91 Hawai'i at 415, 984 P.2d at 1241, because it revolves around the credibility of the only two parties in the bedroom at the time the alleged sexual assault took place— C.E. and McElroy.[9] This case is also similar to *Rogan* because there "were no independent eyewitnesses" to the alleged assault and the Prosecutor's case against McElroy "depended heavily on [C.E.'s] testimony." *Id.*

Initially, the jury was unable to attain a unanimous verdict on any of the five counts against McElroy. In fact, the jury was only able to agree to one guilty verdict—Count I in the lesser included third degree. For the remaining charges, the jury found McElroy not guilty on Count V, and was unable to reach a verdict on Counts II, III, and IV.

Given that the case was based on C.E.'s version of events versus McElroy's version, "we cannot say that the evidence of criminal conduct against [McElroy] was overwhelming." *Rogan,* 91 Hawai'i at 415, 984 P.2d at 1241.

Based on the above analysis, we conclude that the Prosecutor's mistake/error leading to McElroy's statement about drugs and gangs was not harmless beyond a reasonable doubt. A reasonable possibility exists that the prejudicial testimony that resulted from the Prosecutor's prosecutorial mistake/error could have contributed to McElroy's conviction and, therefore, denied McElroy's right to a fair and impartial trial. *St. Clair,* 101 Hawai'i at 286, 67 P.3d at 785. Therefore, we vacate his conviction.

### G. Denial of Defendant's Motion for Mistrial

In light of our decision, it is not necessary for us to decide whether the trial court abused its discretion in denying McElroy's motion for a mistrial.

### CONCLUSION

Accordingly, we vacate the June 7, 2002 Judgment Guilty Conviction and Probation Sentence in which McElroy was (1) convicted and found guilty of Sexual Assault in the Third Degree, in violation of Hawaii Revised Statutes § 707–732(1)(a), and (2) sentenced to five years' probation subject to special terms and conditions. We remand this case to the circuit court for a new trial consistent with the holdings in this opinion.

---

present circumstances, would be more prejudicial.

9. S.W.'s credibility is also an issue in this case, but her testimony relates to McElroy's alleged assault upon her and may be relevant to his

apparent aggressiveness towards women on that particular night. However, S.W. was not in the room at the time of the incident between McElroy and C.E., and she cannot attest to what occurred or what was said between McElroy and C.E.

Dissenting Opinion by NAKAMURA, J.

I agree with the majority's distinction between prosecutorial misconduct and prosecutorial error. Trial lawyers are required to make countless judgment calls under the stress and pressure of trial. A judgment call that we later determine on appeal to have been made in error should not be labeled "misconduct" simply because it was made by a prosecutor.[1] Instead, as this opinion properly recognizes, the label of "prosecutorial misconduct," with its attendant disciplinary repercussions, should be limited to dishonest and deceitful acts made in bad faith.

I also agree with the majority's determination that the Deputy Prosecuting Attorney did not engage in prosecutorial misconduct. The record shows that the prosecutor did not deliberately or intentionally attempt to elicit evidence linking the defendant to prior criminal activity.

Where I part company with the majority is its conclusion that the prosecutor must shoulder the blame for the disclosure of the improper evidence. Both the prosecutor and the defendant played a role in the jury's exposure to this evidence. In my view, it was the defendant who was primarily responsible for the disclosure. I would therefore treat the improper evidence as being volunteered by the defendant and affirm the trial court's refusal to order a mistrial.

A. The Defendant Was Primarily Responsible for the Disclosure of His Prior Bad Conduct

Prior to trial, the court granted the defendant's motion in limine to exclude evidence relating to any prior criminal or bad acts by the defendant.[2] Therefore the defendant and his attorney knew that if they stayed away from subjects related to the defendant's prior conduct and background, they could safely avoid the risk of any prior bad acts being exposed. Nevertheless, in the course of attempting to portray himself in a positive light, the defendant strayed into the subject of his prior conduct and background during his direct examination.

Q. Why did you join the Navy?

A. Because to make my family proud. And I was doing bad and I wanted to change and stuff like that.

Defendant went on to testify that he joined the Navy because it would help him "[g]o to college and see the world and just learn something new."

On cross-examination, the prosecutor sought to clarify the defendant's direct testimony that he joined the Navy "to change" by asking, "Change from what?" In response, the defendant testified, "Well, when I was back home, I was doing bad. Well, I was hanging with the wrong people—drugs and gang-banging and stuff like that. And I got tired of doing that."[3]

The prosecutor's question was a reasonable follow-up to the defendant's direct testimony that he had joined the Navy "to change." A prosecutor is entitled to develop and clarify matters broached by a defendant on direct examination. State v. Palisbo, 93 Hawai'i 344, 360, 3 P.3d 510, 526 (App.2000) ("Cross-examination includes 'full development of matters broached on direct examination, including facts reasonably related to matters touched on direct.' "); Lambert v. State, 448 N.E.2d 288, 292 (Ind.1983) (holding that it was proper for the prosecutor to ask questions to clarify matters raised by the defendant on direct examination, even though the questions prompted the defendant to reveal his prior criminal activity); People v. Briggman, 21 Ill.App.3d 747, 316 N.E.2d 121, 127 (1974) (finding that it was proper for the prosecutor to pursue a line of

---

1. Appellate courts do not routinely characterize trial errors made by civil litigants, criminal defense lawyers, or trial judges as "misconduct."

2. As the majority notes, both the defendant's motion and the court's order were unspecific and failed to describe the prior alleged criminal or bad acts being precluded. The motion and order, therefore, provided little notice to the prosecutor of what particular matters he should avoid.

3. From the defendant's answer it is not clear whether he had been engaged in "drugs and gang-banging" or whether he was simply tired of "hanging with" others, i.e., the wrong crowd of people, who were engaged in those activities. However, in either event, I agree with the majority that the jury should not have been exposed to this information.

questioning which was initiated by the defendant).[1]

The prosecutor neither intended nor expected his question to elicit the defendant's response. The most compelling support for this conclusion comes from the actions and statements of the defendant's own attorney. First, the defendant's attorney did not object to the prosecutor's "[c]hange from what?" question. Then, after the defendant disclosed the information linking himself to past criminal activity, the defendant's lawyer told the judge at side bar, "Well, Judge, I have to move for a mistrial. *I did not anticipate that answer from [the defendant].*" (Emphasis added.)

Certainly, the defendant's lawyer knew more about the details of his client's background, including any past criminal behavior, than the prosecutor. If the defendant's own lawyer did not anticipate that the prosecutor's question would elicit the defendant's response, I find it difficult to blame the prosecutor for not anticipating that response. The trial judge, who had a "front row seat" from which to assess the context of the prosecutor's question, also did not attribute any blame to the prosecutor. Instead, both the defendant's lawyer and the trial judge accepted the prosecutor's explanation that he was simply following up on the defendant's direct testimony and did not expect the defendant's answer.

I find it particularly significant that it was the defendant himself who disclosed the unfavorable information. Unlike most other witnesses, a prosecutor does not have pretrial access to a defendant. A prosecutor cannot interview a defendant before trial to determine how he or she is likely to respond to certain questions. Instead, it is a defendant's lawyer who is able to obtain details regarding a defendant's background, anticipate a defendant's response to questions, and caution a defendant against straying into subjects or providing answers that will result in the disclosure of inadmissible evidence. A

prosecutor should not be penalized for failing to read a defendant's mind.

The prosecutor's general question, "Change from what?", did not call for nor require the defendant to answer that he had been "hanging with" people engaged in "drugs and gang-banging." The defendant could have given a truthful answer that did not reveal these unfavorable details. *Commonwealth v. Roderick*, 429 Mass. 271, 707 N.E.2d 1065, 1068 (1999) (finding that the prosecutor did not violate the court's *in limine* order where the defendant could have truthfully answered the question without disclosing the evidence precluded by the order). For example, the defendant could have answered that he wanted to change from not living up to his potential or from engaging in unproductive activities. He could have truthfully answered in numerous other ways without disclosing details protected by the *in limine* order. Instead, the defendant volunteered the unfavorable details that he now claims entitled him to a mistrial. *State v. Stills*, 125 N.M. 66, 957 P.2d 51, 62 (1998) (rejecting a claim of prosecutorial misconduct where the defendant could have answered the prosecutor's question without disclosing details precluded by the trial court's *in limine* order).

On balance, I believe it was the defendant, and not the prosecutor, who was primarily responsible for the disclosure of the defendant's prior bad conduct. In my view, the defendant's unexpected disclosure of this information should be analyzed as being volunteered by the defendant, rather than as the product of prosecutorial error.

### B. The Trial Court Did Not Abuse Its Discretion in Refusing to Order a Mistrial

The denial of a motion for a mistrial is reviewed under the abuse of discretion standard. *State v. Loa*, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272 (1996). A trial court does not abuse its discretion unless it "clearly exceeds the bounds of reason or disregards

---

4. The defendant's testimony on direct that, "I was doing bad and I wanted to change and stuff like that," was ambiguous. "Doing bad" could mean many things, including being unemployed, being lazy, being in poor physical shape, or could simply be an expression of general dissatisfaction with one's progress or station in life. It does not equate to prior criminal acts.

rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Ganal,* 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (quoting *State v. Furutani,* 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994)).

As the majority correctly notes, damaging statements volunteered by a defendant generally are not grounds for declaring a mistrial. *E.g., Commonwealth v. Fahy,* 512 Pa. 298, 516 A.2d 689, 696–97 (1986) (affirming the denial of a mistrial where the defendant volunteered that "he could have been locked up," in response to a question regarding how many months he had lived at a particular residence); *People v. Kirkwood,* 17 Ill.2d 23, 160 N.E.2d 766, 771 (1959) (affirming the denial of a mistrial where the defendant volunteered information regarding his prior arrest in response to a question concerning whether he had been attending school). Courts have upheld the denial of mistrials even when a prosecution witness disclosed the damaging information, where the answer, although responsive to the prosecutor's question, was not expected. *E.g., State v. Barragan,* 131 N.M. 281, 34 P.3d 1157, 1167–68 (N.M.Ct.App.2001) (testimony that the defendant would be recognized by officers at the detention center); *People v. Mims,* 278 A.D.2d 822, 717 N.Y.S.2d 446, 447 (N.Y.App. Div.2000) (testimony that the defendant was notorious for selling crack cocaine); *State v. Sorina,* 499 So.2d 376, 378–79 (La.Ct.App. 1986) (testimony that the defendant had been arrested on another charge); *People v. McQueen,* 85 Mich.App. 348, 271 N.W.2d 231, 232 (1978) (testimony alluding to the defendant's past incarceration).

In this case, the defendant's reference to his prior bad conduct was brief. The trial court immediately struck the defendant's answer and gave a strong curative instruction advising the jury to "disregard" as "not relevant" anything the defendant did prior to joining the Navy. This curative instruction was reinforced when the court again instructed the jury prior to its deliberation to "disregard entirely any matter which the court has ordered stricken." The defendant's prior bad conduct testimony was not exploited by the prosecution nor further mentioned during the trial. Under these circumstances,

the trial court did not abuse its discretion in denying the defendant's motion for mistrial.

## C. Conclusion

I believe that the defendant was primarily responsible for the disclosure of the details regarding his own prior bad conduct, and that the trial court did not abuse its discretion in refusing to order a mistrial. I would affirm the defendant's conviction. Accordingly, I respectfully dissent.